78 P.3d 23

**FOUNDATION INTERNATIONAL, INC., Plaintiff–Appellant/Appellee,**

v.

**E.T. Ige CONSTRUCTION, INC., Defendant/Crossclaim Plaintiff & Defendant–Appellee/Appellant,**

**Harold T. Miyamoto & Associates, Inc., Defendant/Crossclaim Plaintiff & Defendant–Appellee.**

and

**E.T. Ige Construction, Inc., Third Party Plaintiff/Counterclaim, Defendant–Appellant/Appellee,**

v.

**State of Hawai'i, Department of Transportation, Highways Division, Third Party Defendant/Counterclaimant–Appellee.**

No. 21479.

Supreme Court of Hawai'i.

Oct. 23, 2003.

Reconsideration Denied Dec. 23, 2003.

David Schulmeister & James H. Ashford, & Patrick W. Hanifin (Cades Schutte Fleming & Wright), on the briefs, for Plaintiff–Appellant/Appellee Foundation International.

William M. McKeon & Carla M. Nakata (Paul, Johnson, Park & Niles), on the briefs, for Defendant/Crossclaim Plaintiff & Defendant–Appellee/Appellant, & Third–Party Plaintiff/Counterclaim, Defendant–Appellant/Appellee E.T. Ige Construction, Inc.

Randall K. Schmitt (McCorriston Miho Miller Mukai), on the briefs, for Defendant/Crossclaim Plaintiff & Defendant–Appellee Harold T. Miyamoto & Associates, Inc.

Jack A. Rosenzweig, Deputy Attorney General, State of Hawai'i, on the briefs, for Third Party Defendant/Counterclaimant–Appellee State of Hawai'i, Department of Transportation.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We affirm the summary judgment in favor of Third–Party Defendant/Counterclaimant–Appellee State of Hawai'i, Department of Transportation, Highways Division (the State), the owner of the subject construction project; Defendant/Crossclaim Plaintiff & Defendant–Appellee/Appellant, and Third–Party Plaintiff/Counterclaim Defendant–Appellant/Appellee E.T. Ige Construction, Inc. (Ige), the general contractor on the project; and Defendant/Crossclaim Plaintiff & Defendant–Appellee Harold T. Miyamoto & Associates, Inc. (Miyamoto), an engineering firm; as against Plaintiff–Appellant/Appellee Foundation International, Inc. (Foundation), an excavation subcontractor, inasmuch as: (1) the subject contract provided that (a) a four foot basalt [1] embedment for bridge supports was a minimum depth requirement and (b) the State engineer would determine the final drilling depth into basalt; (2) under such terms, no additional payment under an equitable adjustment or substantial change clause in the contract to Foundation was necessary for drilling in excess of four feet into basalt; (3) Foundation failed to demonstrate any material change to site conditions from that indicated in the contract so as to raise a genuine issue of material fact; and (4) an *ex parte* conversation between the Circuit Court of the Second Circuit (the court) [2] and counsel for the State regarding the order herein involved an administration or "housekeeping" matter not requiring the court to recuse or disqualify itself. Accordingly, we affirm the October 1, 1996 order granting summary judgment in favor of the State and Ige and denying Foundation's motion for summary judgment, the October 21, 1996 order granting summary judgment in favor of Miyamoto, and the court's March 9, 1998 final judgment.

I.

A.

The facts of this case, as found by the court and relevant to our decision, are rela-

---

1. Basalt is "a dark-grey to black dense to fine-grained igneous rock[.]" *Webster's Third New Int'l Dictionary* 180 (1986).

2. The Honorable Judge Boyd P. Mossman presided over the case.

tively undisputed. This case arises out of a payment dispute over public works project No. BR–RS–0360(8), the Hoolawa Bridge Replacement and Approaches (the project). The project involved the construction of a new concrete bridge across Hoolawa Stream on the island of Maui. One aspect of the project involved the construction of seventy-one "cast-in-place piles, also known as 'drilled shafts[.]'" Under the terms of the disputed contract, a drilled shaft is a

> [thirty]-inch diameter hole *excavated from a set elevation (the "bottom footing elevation") into the subterranean hard basalt layer.* A cage-like structure of steel reinforcing bars matching the shape of the shaft is inserted into the hole, and then concrete is poured. The result is a reinforced concrete pile or shaft, extending from within the basalt layer up to the bottom-footing elevation, upon which the bridge abutments are constructed.

(Emphasis added.) The bottom of a drilled shaft is called the "bottom tip elevation." The top of the shaft is the "bottom footing elevation." The term "pile tip elevation" refers to the depth of the drilled shaft. On page S–3 of the project plans, the bottom footing elevation is listed at 474.5 feet and the "approximate drilled shaft tip elev[ation]" is listed at 459 feet. The difference between these two figures results in a drilled shaft length of 15.5 feet. The project plans required thirty-five drilled shafts at abutment[3] number one, on the Kahului side of the stream, and thirty-six drilled shafts at abutment number two, on the H;ana side. On appeal, only the shafts at abutment number one are involved.

The bridge design plans and specifications were prepared by Miyamoto. Miyamoto hired the firm Ernest K. Hirata and Associates, Inc. (Hirata) to assist with "geotechnical engineering services" related specifically to the construction of the drilled shafts.

General contractors submitted their bids for the project on an official proposal form (proposal) pursuant to a public bidding process. A schedule attached to the proposal contained bid lines for the drilled shaft work. The first item, number 510.1000, labeled "Cast-in-place piles in drilled holes[,]" referred to the cost of constructing the reinforced concrete piles in the excavated shafts. The second item, number 510.2000, was labeled thirty "Diameter predrilled holes for cast-in-place concrete piles[,]" and was the bid line for the cost of excavating the drilled shafts. In reference to these two items, it is undisputed that "[t]he schedule estimated 963 linear feet for each of these bid items"[4] and "[b]idders were required to submit a price per linear foot for work required under each of these bid items."

With respect to pricing these items, "the price bid per linear foot is called a 'unit price.'" Under the bid, "[t]he unit price bid on [both of] these two items were multiplied by the estimated 963 linear feet to establish a proposed cost for the estimated amount of drilled shaft work required for the [p]roject[.]" This "enabled the State to compare the bids and determine the lowest bidder." (Emphasis added.) Thus review of the bids was accomplished by comparing the proposed cost per linear foot submitted by each bidder for each item.

Before submitting its bid for the whole project, the general contractor, Ige, received an unsolicited proposal from Foundation to do the drilled shaft work. In this proposal, Foundation described abutment one drilled shaft work as being "35 piles of *15 foot length* [,]" (emphasis added), and abutment two drilled shaft work as being "36 piles of 12 foot length." Foundation quoted a lump sum amount of $361,125 for both excavation and concrete work for "approximately" 963 linear feet for both abutments. Any additional shaft excavation necessary was proposed at a price of $175 per linear foot.

---

**3.** An abutment is defined as "the part of a structure that directly receives thrust or pressure (as of an arch, vault, beam, or strut)[.]" *Webster's Third New Int'l Dictionary* at 8.

**4.** It appears that 963 feet is in relation to the total amount of material to be excavated. In turn, however, 963 linear feet of reinforced concrete piles are necessary to fill the excavated holes. It appears that in order to calculate costs, these two items were separated. Thus, the 963 linear feet total was multiplied against *both* items.

Based on Foundation's proposal, Ige submitted a proposal to the State with a unit price of $194 per linear foot on bid line item number 510.2000.[5] Ige never intended to conduct drill shaft work itself, but always intended to subcontract that portion of the work if it was the successful bidder. Thus, Ige relied upon the prices quoted by Foundation.

## II.

On August 6, 1992, the State and Ige entered into a contract for the project. This contract expressly incorporated the "notice to bidders, the instructions to bidders, the proposal and plans for [the project,]" as well as all amendments, deletions and additions attached to the contract.[6] On sheet S–1 of the project plans, incorporated into the contract, was the statement that "[d]rilled shafts for abutments and wing walls shall be embedded at least 4 feet into basalt[.]" On sheet S–25, which is entitled "Drilled Shaft Details[,]" is an illustration depicting a sloping basalt layer to the bottom of the pile with " '4'–0' min.[7] embedment into basalt" indicated. Also, the caption to this illustration read, in relevant part, as follows:

6. Pile tip elevations shown on the longitudinal section (sht.S–3) *are estimated elevations. The actual pile tip elevations will be determined by the Engineer.*

7. Drilled shafts shall extend a minimum of four feet into basalt.

(Emphasis added.) The public bid document contained a similar section, which stated that

*[i]t is understood that the quantities given in the attached proposal schedule are approximate only and are intended principally to serve as a guide in determining and comparing the bids. It is further understood that the Department of Transportation does not, expressly or by implication, agree that the actual amount of*

*work will correspond therewith, but reserves the right to increase or decrease the amount of any class or portion of the work, or to omit portions of the work,* as may be deemed necessary or advisable by the Director of Transportation, and that *all increased or decreased quantities of work shall be performed at the unit prices* set forth in the attached proposal schedule except as provided for in the specifications.

(Emphases added.)

On January 13, 1993, Ige and Foundation entered into a subcontract for bid items 510.1000 and 510.2000. The subcontract referred to Foundation's proposal to Ige and related that payment was to be on a unit price basis. It also stated that Foundation consented to be bound by the terms and specifications of the contract between the State and Ige.

## B.

Upon drilling, Foundation reached the basalt layer at abutment one a few feet below the bottom footing elevation. Foundation drove the shaft four feet into the basalt and announced its intention to drill no further. The State protested, insisting that the plans and specifications indicated that the shaft must be excavated to the approximate tip elevation. Accordingly, the State argued that Foundation must drill at least fifteen feet and, only if at that point four feet of basalt had been excavated, could Foundation then stop drilling.[8]

Foundation protested to Ige, which in turn, protested to the State that the plans did not depict a minimum pile length. Because of the additional excavation through the basalt, Foundation argued it was required to do more expensive digging than it had allegedly planned in its estimate and price proposal. On March 15, 1993, Ige notified the State in writing of its intention to claim additional

---

5. Item number 510.1000 does not appear to be at issue in this controversy.

6. Accordingly, the "notice to bidders, instructions to bidders, the proposal and plans," as well as all amendments, deletions and additions are treated as part of the contract and are hereinafter collectively referred to as "the contract."

7. There is no dispute that "min." means "minimum."

8. The fifteen foot length was the same as that stated in Foundation's proposal to Ige. See *supra* page 491, 78 P.3d at p. 27.

compensation for the alleged additional excavation.

In response, the State's engineer requested that Miyamoto review the design to determine whether more than four feet of embedment into the basalt was necessary from an engineering viewpoint. Paul Morimoto, an engineer at Miyamoto who drafted the initial proposal, wrote a memorandum to Miyamoto's head engineer of the project, Lester Shoji, indicating that a four-foot embedment requirement was sufficient. For unknown reasons, Shoji disagreed and informed the State engineer that a minimum pile length of twelve feet and a minimum embedment requirement of four feet was required. Accordingly, Foundation was instructed that all shafts must be at least twelve feet in length, even if more than four feet of basalt had to be excavated. Foundation was not aware of Morimoto's memorandum until it was obtained in discovery.

Foundation took the position that any excavation beyond the four feet embedment was "extra work" or a "type one differing site condition" for which it was entitled extra compensation. Foundation repriced all work involving the seventy-one shaft excavations, applying the "force account" [9] pricing formulas established in the contract. This bill was given to Ige, who passed on a similar version to the State.

### III.

Foundation moved for partial summary judgment against Ige, arguing that it was entitled to compensation in excess of the contract unit price as a consequence of extra work and/or differing site conditions in the excavations at abutment one. Ige responded accordingly, filing summary judgment motions against both the State and Foundation, generally seeking to pass on any expenses allegedly owed by it to the other parties. The State moved for summary judgment against Ige, maintaining that the contract

was unambiguous as to the unit price of $194 per linear foot of material excavated.

On August 20, 1996, Judge Mossman orally granted the State's motion for summary judgment against Ige and Ige's motion for summary judgment against Foundation. Foundation's motion for partial summary judgment requesting additional compensation on abutment one against Ige was denied. Thus, Ige's corresponding motion for summary judgment against the State was also denied. Judge Mossman ordered the State's counsel, Mr. Rosenzweig, to prepare the written order which was circulated sometime thereafter. The third sentence of Conclusion of Law G of this proposed order stated as follows:

> Even if it was reasonable for the contractor to plan the job on the basis that the plans showed only four feet of rock drilling per shaft (the Court is not making any ruling regarding the reasonableness of such interpretation), it knew that the actual pile tip elevations would be determined by the [State] [e]ngineer.

On September 4, 1996, Miyamoto moved for summary judgment and argued that the court's prior ruling implicitly meant that the plans were not ambiguous and, thus, all claims against it must fail. On September 6, 1996, a hearing was held on this motion and Foundation argued that the State had conceded that the contract was ambiguous. In response, Miyamoto opined that Judge Mossman could avoid this issue by finding the contract was not ambiguous and rule in its and the State's favor. Judge Mossman then announced that he had always intended on ruling that the contract was unambiguous and orally granted summary judgment in favor of Miyamoto.

Later on the same day, Judge Mossman called Mr. Rosenzweig about the proposed order on the prior summary judgment motions and indicated that the third sentence of conclusion G, reproduced above, should be deleted.[10] Following this call, Mr. Rosenz-

---

9. Section 109.04, the extra and force account work provision, states that "[e]xtra [w]ork will be paid for at the unit prices or lump sum prices stipulated in the order authorizing the work" or according to a force account basis, which refers

to an extensive list detailing payment depending on equipment use, materials, and labor.

10. At the November 6, 1996 hearing on the disqualification motion, discussed *infra*, Judge

weig sent a letter to all of the parties·stating that

> [Judge Mossman] specifically asked what the need or justification was for the inclusion of the third sentence of Conclusion of Law G on page 23. After a lengthy discussion, [Judge Mossman] advised me that the content of that sentence was not part of the basis of the decision he reached on the State's motion. Accordingly, he stated that he would not sign the final document with that sentence included.
>
> At his direction, that sentence of Conclusion G is being deleted.

Attached to Mr. Rosenzweig's letter was an amended copy of the proposed findings and conclusions, which deleted the sentence from conclusion G.

On October 1, 1996, the order granting summary judgment in favor of the State against Ige, granting summary judgment in favor of Ige against Foundation, denying Foundation's partial summary judgment against Ige, and denying Ige's partial summary judgment against the State was filed. On October 9, 1996, Foundation moved for Judge Mossman's disqualification because of his *ex parte* communication with Mr. Rosenzweig. On October 21, 1996, the order granting Miyamoto's motion for summary judgment was filed. On November 6, 1996, after a hearing, the court denied the disqualification motion and the order was filed on December 4, 1996. Final judgment was entered on March 9, 1998.

### IV.

On appeal, Foundation contends that the court erred in denying its motion for summary judgment and granting summary judgment for the State, Ige, and Miyamoto. It is contended that: (1) the project plans unambiguously provides that the four-foot embedment criterion controls over the estimated pile length; (2) any additional work beyond

the four-foot requirement should have been paid on a force account basis or the contract price equitably adjusted; (3) in the alternative, if the contract is ambiguous, then Foundation's interpretation is reasonable and must be adopted; (4) the State's concession that Foundation's interpretation of the plans was reasonable was fatal to the State's argument for summary judgment; (5) the differing site conditions clause applies to Foundation's claims; (6) whether the subsurface conditions encountered were "materially" different is a question of fact; (7) the court erred in granting Miyamoto's motion for summary judgment because it previously ruled that the contract was ambiguous;[11] and (8) Judge Mossman erred in refusing to recuse himself after his impartiality was called into question by an improper *ex parte* conversation with the State's counsel.

### V.

### A.

▆▆▆ As its first argument on appeal, Foundation contends that the contract unambiguously provides for a four foot embedment criterion that controls over any estimated pile length. This court reviews a "circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court." *Acoba v. General Tire, Inc.*, 92 Hawai'i 1, 10, 986 P.2d 288, 297 (1999) (citing *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992)). Under that standard,

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.*

▆▆▆ In addition, "[a]s a general rule, the construction and legal effect to be given a

---

Mossman explained that he called Mr. Rosenzweig because "all I wanted to know . . [was] why [Mr. Rosenzweig] put [the sentence] in there. It wasn't necessary. That was part of his argument and it wasn't part of my ruling, and I wanted to explain to him it wasn't necessary and I don't want it in there." Judge Mossman further stated that, by his estimation, the telephone

conversation was only between five to ten minutes long.

11. Insofar as we determine that the contract is unambiguous, *see infra*, we do not address this argument.

contract is a question of law." *Hanagami v. China Airlines, Ltd.,* 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984) (citations omitted). In interpreting the plans and specifications, "[a]bsent an ambiguity, [the] contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Cho Mark Oriental Food, Ltd. v. K & K Int'l,* 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992) (citation omitted).

### B.

In support of its argument, Foundation relies upon several terms of the contract which refer to the extent to which the shaft shall extend into the basalt embedment. Foundation points to sheet S–1, which states that "[d]rilled shafts for the abutments . . . shall be embedded *at least 4 feet* into the basalt"; sheet S–25, which states that "[d]rilled shafts shall extend *a minimum of four feet* into basalt"; and sheet S–3, which indicates that estimated pile tip elevations were based on the four-foot embedment criterion. (Emphases added.) Additionally, Foundation relies on Hirata's recommendation that embedment be "*at least 4 feet* into basalt[.]" (Emphasis added.)

However, there is nothing in the plans or specifications to support Foundation's contention that the embedment criterion controls over the estimated pile lengths. As indicated above, pages S–1, S–3, and S–25 expressly indicate that the embedment was to be "at least" or a "minimum" of four feet into basalt. The use of the terms "at least four feet" and a "minimum of four feet" indicates only a minimum depth, with the possibility of greater excavation.[12] *Cf. Commonwealth Dept. of Trans v. Acchioni & Canuso, Inc.,* 14 Pa.Cmwlth. 596, 324 A.2d 828, 831 (1974) ("The plain meaning of 'minimum' 7 gauge infers that a thicker gauge may be required and such was properly contemplated under the contract."). Therefore, the plain language of the contract does not indicate that excavation was limited to four feet of embedment.

### VI.

### A.

■ Relying upon the conclusion that a four-foot embedment controls the depth of the pile length, Foundation secondly argues that any excavation beyond this requirement should be paid on a force account basis or that an equitable adjustment to the contract price should be made. Foundation cites to two provisions for this proposition, section 104.02, which is entitled "Alterations of Plans or Type of Work[,]" and section 104.03, which is entitled "Extra Work."

Section 104.02 provides that if the contracted work is substantially changed, "an allowance will be made on such basis as may have been agreed to in advance of the performance of the work involved, or in case no such basis has been previously agreed upon, then an equitable adjustment in the contract price will be made." A "substantial change" is work that is "different in kind, nature or cost from any item called for in the original contract."

Special provision 104.03 defines "extra work" as work determined by the State engineer as "not covered by any of the various items or by combination of such items for which there is a bid price" or work "specifically designated" as such in the contract.[13]

Foundation's argument that a substantial change occurred by the requirement to excavate beyond four feet of basalt is unpersuasive. There are no allegations that the work performed was different in kind, nature, or cost beyond the requirement that Foundation excavate up to twelve feet, including more than four feet of basalt. As stated *infra,* it is apparent from the contract that the State engineer had the authority to determine the final pile length. *See infra* Part VII.B.

In addition, there are express uncontested findings that Foundation's president testified he was aware that excavation could go to twelve feet. Foundation's president "ac-

---

12. Moreover, as indicated below, there is clear language indicating that the actual length of the pile was to be determined by the State engineer. *See infra* Part VII.B.

13. Although not determinative to this analysis, it does not appear that the State engineer designated the contested excavation to be "extra work" as required under special provision 104.03.

knowledged that before deciding on the price to be proposed to Ige, it knew ... [t]he required piles could be terminated at a shallower depth than shown on the plans, or could be much deeper than shown on the plans[.]" In addition, "[t]he use of the word 'approximate' in the plans and specifications meant that the as-built length of the drilled shafts could vary from the 15 and 12 foot lengths used by [Foundation] for its proposal ... by ten or fifteen feet one way or the other." Accordingly, excavation up to twelve feet was not work that was "different in kind, nature or cost" from the original contract.

Similarly, there does not appear to be any basis for considering excavation beyond four feet as "extra work." *See Green Constr. Co. v. Kansas Power & Light Co.*, 1 F.3d 1005, 1010 (10th Cir.1993) (indicating that "there can be no recovery for extra work if the work is covered by the terms of the contract" (citing 13 Am.Jur.2d *Building and Construction Contracts*, § 19 (1964 & Supp.1993)); *Candee Const. v. Dept. of Transp.*, 447 N.W.2d 339, 343 (S.D.1989) (defining extra work as " 'work or costs arising outside of and entirely independent of the contract; that is, something not required in its performance, not contemplated by the parties, and not controlled by the contract' ") (quoting *Sweetman Const. Co. v. State*, 293 N.W.2d 457, 460 (S.D.1980))); *Air Cooling & Energy, Inc. v. Midwestern Const. Co.*, 602 S.W.2d 926, 931 (Mo.App.1980) (holding that "the removal of the rock was not extra and unforeseen work or a physical condition outside the agreement between the parties").

In *Hi–Shear Tech. Corp. v. United States*, 53 Fed. Cl. 420 (2002), *reconsideration denied*, 55 Fed. Cl. 418 (2003), the United States Court of Federal Claims explained that "estimated contract requirements do not represent a guarantee or warranty and, normally, significant variance between estimated requirements and actual orders will not result in liability on the part of the government in the absence of bad faith, negligence, or a showing of a grossly unreasonable estimate." *Id.* at 428–29 (citation omitted). Inasmuch as the work done was covered under the contract estimates, there has been no showing of "bad faith, negligence, or a showing of a grossly unreasonable estimate." *Id.* Thus, it does not appear that Foundation demonstrated any basis for additional payment.

## VII.

### A.

■■■ In the alternative, Foundation argues thirdly that if the contract terms are ambiguous, then its interpretation must be enforced, as a contract should be construed against the drafter. Foundation maintains that it "relied upon the more than 40 years of experience of its President[,]" who "understood that the design intent, with regard to the length of each pile, was that it would vary depending upon the depth at which the four[-]foot minimum embedment into basalt requirement was satisfied—but that *the four[-]foot embedment length itself would be constant*." (Emphasis in original.) Also, Foundation relies upon the memorandum written by Morimoto after this dispute arose which indicated that the four-foot embedment requirement should control the pile length.[14]

■■■ Generally, the determination of whether a contract is ambiguous is also a question of law. *See Cho Mark Oriental Food, Ltd.*, 73 Haw. at 520, 836 P.2d at 1064. To determine whether ambiguity exists, this court has said that "the test lies not necessarily in the presence of particular ambiguous words or phrases but rather in the purport of the document itself, whether or not

---

14. This memorandum appears to have little bearing on our interpretation of the contract because it was (1) written subsequent to the drafting of the contract and (2) was not relied upon by any of the parties in any substantive manner. Accordingly, it appears that the memorandum falls under the parol evidence rule and this court cannot consider it in determining whether the contract itself is ambiguous. *See State Farm Fire & Cas. Co. v. Pacific Rent–All, Inc.*, 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) ("The court should look no further than the four corners of the document to determine whether an ambiguity exists." (Citations omitted.)); *Amfac, Inc.*, 74 Haw. at 124–25, 839 P.2d at 31 (noting that "parol evidence regarding the parties' intent as to the language used in a contract may be considered only when the contract language is ambiguous" (citations omitted)), *reconsideration denied* (1992).

particular words or phrases in themselves be uncertain or doubtful in meaning." *Hokama v. Relinc Corp.*, 57 Haw. 470, 474, 559 P.2d 279, 282 (1977) (quoting *Bishop Est. Trust v. Castle & Cooke*, 45 Haw. 409, 421, 368 P.2d 887, 894 (1962)). A "court should look no further than the four corners of the document to determine whether an ambiguity exists." *State Farm Fire & Cas. Co. v. Pacific Rent–All, Inc.*, 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) (citing *KL Group v. Case, Kay & Lynch*, 829 F.2d 909, 916 (9th Cir.1987)). "[T]he parties' disagreement as to the meaning of a contract or its terms does not render clear language ambiguous." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Fermahin*, 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); *Hawaiian Ins. & Guar. Co. v. Chief Clerk of the First Circuit Court*, 68 Haw. 336, 342, 713 P.2d 427, 431 (1986)).

When an ambiguity exists so that there is some doubt as to the intent of the parties, intent is a question for the trier of fact. *See Bishop Trust Co., Ltd. v. Central Union Church of Honolulu*, 3 Haw.App. 624, 628, 656 P.2d 1353, 1356 (1983) (citing *DiTullio v. Hawaiian Ins. & Guaranty Co.*, 1 Haw.App. 149, 616 P.2d 221 (1980)). In the absence of any ambiguity, a question of construction arising upon the face of the instrument is for the court to decide. *See id.* (citing *Reed & Martin, Inc. v. City & County of Honolulu*, 50 Haw. 347, 440 P.2d 526 (1968); *Clarkin v. Reimann*, 2 Haw.App. 618, 638 P.2d 857 (1981)).

### B.

In the instant case, we conclude that no ambiguity exists in the terms of the contract, as the plain language of the "contract is definite and unambiguous." *State Farm Fire & Cas. Co.*, 90 Hawai'i at 324, 978 P.2d at 762. The contract is clear that the unit price provision was to control in determining how the contractor was to be paid for any increase or decrease to the estimates of drill shaft excavation. The letter accompanying the official proposal form for the project states that "increased ... quantities of work shall be performed at unit prices" as indicated in the proposal schedule "except as provided for in the specifications." Special Provision section 510.12 states that unclassified shaft excavation and unclassified extra depth excavation [15] would be paid "at the contract unit price per linear foot of the diameter specified" in "full compensation" for the excavation.

Also, the undisputed findings indicate that the contract defined the shaft excavation as all work "required to *excavate* and maintain a drilled shaft hole of *the dimensions shown in the plans, specifications or as directed by the [State] Engineer*." (Emphases in original.) As noted earlier, the plans indicate that the "[p]ile tip elevations shown on the longitudinal section (sht.S–30) are *estimated* elevations. The actual pile tip elevations will be determined by the [State] Engineer." (Emphasis added.) Accordingly, under its plain terms, the contract indicates that the drill depth was an estimate, subject to the State engineer's determination.

### C.

Assuming, *arguendo*, that there was some ambiguity or misunderstanding of the contract terms, the ambiguity would be construed against Foundation as a matter of law as it was aware of, or had reason to know of, the State's interpretation of the contract. It is generally accepted that when there is a misunderstanding as to a contract term, and one party knew or reasonably should have known that the other party construed the term in a particular fashion, then that inter-

---

15. The court made undisputed findings regarding the definition of "unclassified shaft excavations" and "unclassified extra depth excavations" as follows:

Unclassified shaft excavation is defined as all processes required to *excavate* and maintain a drilled shaft hole *of the dimensions shown in the plans, specifications or as directed by the Engineer.* The work shall include all shaft excavation, *whether the material encountered is* soil, rock, weathered rock, stone, natural or man-made obstructions, or materials of other description.

Unclassified extra depth excavation is defined as the work required to excavate a drilled shaft of plan dimensions *below the elevation of the bottom of the shaft as indicated on the plans.*

(Emphases in original.)

pretation will control. *See Restatement (Second) of Contracts* § 201(2) (1979); [16] *see also Harris Corp. v. Giesting & Assocs., Inc.*, 297 F.3d 1270, 1273 (11th Cir.2002) (noting that a "party who willingly and without protest enters into a contract with knowledge of the other party's interpretation is bound by such interpretation and cannot later claim that it thought something else was meant" (internal quotation marks and citations omitted)). As the plans and specifications were available to Foundation as part of the invitation to bid, it may be presumed that Foundation was aware of the pile lengths before excavation at the site, and had knowledge that the drilled shaft lengths at abutment one were to be approximately 15.5 feet. Foundation's prior knowledge of the depth of abutment one piles is evident in its April 1, 1992 unsolicited bid to Ige. *That bid acknowledged that the proposal was for work on thirty-five piles at fifteen feet deep and thirty-six piles at twelve feet deep.*

The unchallenged findings in the court's October 1, 1996 order support the conclusion that Foundation was aware of the pile lengths before bidding on the project, as well as before excavation work began, and, thus; could not rely solely on the four-foot embedment language as the sole basis for its bid. In fact, as previously mentioned, the court found that in a deposition, Foundation's president "acknowledged that before deciding on the price to be proposed to Ige" Foundation knew that the term "approximate" meant that the length of the shafts could vary from the fifteen to twelve foot lengths described in the proposal. The court also found that Foundation "knew that the basalt layer at some places in abutment one might be as high as 472 or 473 elevation based upon information derived from the boring logs." [17]

## D.

▮▮▮ In addition, it is generally accepted that where a material term is left unstated, or where confusion plainly exists in the interpretation of a phrase, a contractor has an obligation to clarify a "patent ambiguity" before entering into a contract.

Ambiguities in a government contract are normally resolved against the drafter. An exception to that general rule applies, however, if the ambiguity is patent. *The existence of a patent ambiguity in a government contract raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation. That duty requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid. Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor.*

The patent ambiguity doctrine is a court-made rule that is designed to ensure, to the greatest extent possible, that all parties bidding on a contract share a common understanding of the scope of the project. That objective is particularly important in government contracts, in which significant post-award modifications are limited by the government's obligation to use competitive bidding procedures and by the risk of prejudice to other potential contractors. *In addition, the duty of inquiry prevents contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations*

---

16. The Restatement (Second) of Contracts § 201(2) states this rule as follows:

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is *interpreted in accordance with the meaning attached by one of them if at the time the agreement was made*

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) *that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.*

(Emphases added.)

17. The State notes that the findings demonstrate Foundation acknowledged that, at the time of submitting a bid, it determined that "$175 per linear foot would be a fair return for shaft excavation consisting of 29.5% hard basalt." Looking to the overall quantity of material excavated at both abutment one and abutment two, the State observes that 30% of the material was basalt. Hence the overall quantity of basalt excavated on the entire project was almost exactly what was predicted in the contract.

*in preparing their bids and then, after the award, seeking equitable adjustments to perform the additional work the government actually wanted.*

*Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed.Cir.1997) (internal quotation marks and citations omitted) (emphases added); *See also P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1355 (Fed.Cir.2002) (explaining that "an ambiguity on the face of the contract—a 'patent' ambiguity—triggers a duty on behalf of a public contractor to inquire about that ambiguity before it even bids on a contract" (citations omitted)). "A *patent* ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used." *Black's Law Dictionary,* at 80 (6th ed.1990) (italics in original); *see also Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) ("Thus, a patent ambiguity does not exist where the ambiguity is neither glaring nor substantial nor patently obvious. . . . . If a contract contains a patent ambiguity, the contractor is under a duty to inquire and must seek clarification of the proper contract interpretation." (Internal quotation marks and citations omitted.)); *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 650 (1982) (Determining whether an ambiguity is patent is "not a simple yes-no proposition but involves placing the contractual language at a point along a spectrum: Is it so glaring as to raise a duty to inquire?" (Footnote omitted.)).

The reasoning of the above cited cases appears to be applicable in the circumstances of the instant case. The terms of the contract expressly stated that the State engineer had a right to set the depth of the pile shafts, and, hence, Foundation would have a duty to inquire about any contrary interpretation it might have regarding the effect of this language. Moreover, as stated earlier, the contract utilized language such as "at least four feet" and a "minimum of four feet[,]" thus indicating that more excavation into the basalt layer was possible.

18. An amendment to section 104.02 of the contract defines differing site conditions as "subsurface or latent physical conditions which differ materially from that indicated on the project plans and specifications" and which require the

Consequently, we must reject Foundation's argument that an ambiguity should be construed against the drafter in the instant case, as the purported source of confusion as alleged by Foundation would be readily apparent before entering into a contract. *Cf. State Farm Fire & Cas. Co.,* 90 Hawai'i at 325, 978 P.2d at 763 (holding that, "where the party seeking relief was not mistaken but consciously ignored the fact that he or she had limited knowledge of the facts, he or she effectively bears the risk of that mistake" (citations omitted)); *Amfac, Inc.,* 74 Haw. at 110 n. 5, 839 P.2d at 25 n. 5 ("When the contract has been negotiated between two parties of equal sophistication and equal bargaining power, the rule of interpreting ambiguities against the drafter has been held inapplicable." (Citations omitted)).

## VIII.

As for its fourth, fifth, and sixth arguments, respectively, Foundation maintains that the court erred in granting the State's motion for summary judgment regarding the "Differing Site Conditions" [18] clause because (1) the State conceded that Foundation's interpretation of the plans was reasonable, (2) the unit price provision did not void the differing site conditions clause, and (3) Foundation's differing site conditions claim presented a question of material fact that could not be resolved in summary judgment. *See, e.g., Acoba,* 92 Hawai'i at 10, 986 P.2d at 297 (noting that summary judgment is inappropriate when there is a genuine issue of material fact in dispute).

## A.

In connection with Foundation's first contention regarding the State's motion for summary judgment, it argues that:

The true thrust of the State's motion for summary judgment was that the definition of "unclassified shaft excavation" precludes

State engineer to investigate and evaluate the site "to determine whether or not such conditions are materially different from the project plans and specifications so as to justify an adjustment to the project contract[.]"

any claim for compensation for "Differing Site Conditions" as a matter of law. . . .

Stated simply, *if [Foundation's] interpretation was reasonable, then [Foundation] was entitled to rely upon the fact that the four feet of required embedment per shaft would be held constant* . . . when [Foundation] developed its unit price per lineal foot for shaft excavation. While [Foundation] may have assumed the risk of having to drill through some rocks or boulders in the material above the basalt layer, [Foundation] did not assume the risk that the State might simply change the rules of the game after the drilling commenced by unilaterally imposing a twelve foot minimum pile length requirement not shown on the plans.

(Emphasis added.). However, as stated earlier, it is evident that Foundation's contention regarding the four foot minimum was not reasonable or its interpretation supportable, *see supra* Part VII. There is no basis within the contract language to conclude that Foundation had no obligation to drill beyond four feet of embedment.

### B.

 Foundation's second contention is that the State's definition of "unclassified shaft excavation" in the unit price provision should not preclude any additional claim for compensation under the "Differing Site Conditions" provision. This court has already determined that a unit price provision does not abrogate a separate provision relating to unforeseen circumstances or conditions.

[E]stimates made in invitations for bids for contracts which are to be paid for on a unit price basis are only estimates and not guaranteed amounts. *But it certainly does not mean that [a provision providing for] a modification of the contract to conform to unforeseen subsurface or latent conditions, "or unknown conditions of an unusual nature, differing materially from those ordinarily encountered" is to be canceled out of the contract.* Neither does it mean that all considerations of equity and justice are to be disregarded, and that a contract to do a useful job for the Govern-

ment is to be turned into a gambling transaction.

*E.E. Black, Ltd. v. State of Hawaii*, 50 Haw. 267, 271, 439 P.2d 213, 216 (1968) (ellipsis points and citations omitted) (emphasis added); *see also Constanza Const. Corp. v. City of Rochester*, 147 A.D.2d 929, 931, 537 N.Y.S.2d 394 (N.Y.App.Div.1989) (explaining that where "the differential between the estimated and actual quantities becomes disproportionate, courts have recognized that the unit price provision is not always adequate protection" (citations omitted)). Accordingly, we reaffirm *E.E. Black, Ltd.* and hold that a unit price provision does not *per se* invalidate a differing site conditions clause in the same contract.

### C.

 Associated with the above argument, Foundation asserts that the question of whether the subsurface conditions it encountered differed "materially" from those represented in the plans is a question of fact that could not be decided by summary judgment.

As noted earlier, an amendment to section 104.02 of the standard specifications defines a differing site condition. It states that "subsurface or latent physical conditions which differ materially from that indicated on the project plans and specifications" require the State engineer to investigate and evaluate the site "to determine whether or not such conditions are materially different from the project plans and specifications so as to justify an adjustment to the project contract[.]" Upon such a determination the State engineer and the contractor "shall mutually agree" on an adjustment if one is warranted, but "if no agreement is reached, such work shall be paid for on a force account basis in accordance with Subsection 109.04—Extra and Force Account Work[.]" In addition, this section 104.02 states that "[t]he provisions of this subsection shall not apply to overruns and under runs on items which are estimated in the proposal."

Initially, it appears that the differing site conditions provision does not apply because nothing in the record indicates that the State engineer determined that the conditions were "materially different" from the project plans

and specifications, as was required in the special provisions. *See James A. Cummings, Inc. v. Young,* 589 So.2d 950, 954 (Fla.Dist. Ct.App.1991) ("When parties to a contract agree by its express terms to be bound to the determination made by an architect, that agreement is binding upon the parties. In the absence of fraud, or such mistake as would amount to fraud, the determination made by the architect shall be final." (Citations omitted.)); *Maskel Const. Co, Inc. v. Town of Glastonbury,* 158 Conn. 592, 264 A.2d 557, 560 (1969) (holding that an engineer's determination, as required under the governing contract, was final if made in good faith and in exercise of his or her best judgment); *Lippert Bros., Inc. v. City of Atoka,* 94 F.Supp. 630, 632 (E.D.Okla.1950) ("If parties to a construction contract designate an engineer as arbiter of amount and character of work done and amount due contractor, engineer's approval is binding on the parties, but may be avoided upon showing of actual fraud or gross mistake constituting constructive fraud.") (Citing *City of Lawton v. Sherman Machine & Iron Works,* 182 Okla. 254, 77 P.2d 567 (1938)). As mentioned, the State engineer did not determine the conditions were materially different under 104.02 of the Standard Specifications.

In addition, Foundation failed to establish that the differing site conditions provision applies. As stated, section 104.02, defining differing site conditions, states that it is "not to apply to overruns . . . on items which are estimated in the proposal." The only allegation raised by Foundation is that greater quantities of basalt were discovered at a higher elevation than that estimated. On its face, the definition of a differing site condition appears to exclude this claim as the claim refers merely to an overrun of an item estimated in the contract.

▉▉▉▉ Furthermore, it has been held that in order to prevail on a differing site conditions claim, a contractor must prove that the conditions indicated in the contract differ materially from those encountered during performance. *See Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed.Cir.1987) (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984) (citing *Arundel Corp. v. United States,* 207 Ct.Cl. 84, 515 F.2d 1116, 1128 (1975))). "The conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding." *Id.* (citing *United Contractors v. United States,* 177 Ct.Cl. 151, 368 F.2d 585, 594 (1966)). "The contractor also must show that it reasonably relied upon its interpretation of the contract and contract-related documents and that it was damaged as a result of the material variation between the expected and the encountered conditions." *Id.* (citation omitted). The differing site conditions clause in the instant contract is substantially similar to provisions utilized in federal construction contracts and we believe it should be subject to the same application.

*Perini Corp. v. United States,* 180 Ct.Cl. 768, 381 F.2d 403 (1967), is illustrative. In *Perini Corp.,* a contractor declared that "a substantial variation from an estimated quantity, without more, constitutes an 'unknown physical condition of an unusual nature differing materially from those ordinarily encountered[.]'" *Id.* at 410. In response, the federal court held that a "substantial variation from the estimated quantities" was not enough to establish a changed condition. *Id.* at 411 (citations omitted)

> We reject this argument in view of our consistent holdings that to qualify as a changed condition, the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his [or her] study of the contract documents, his [or her] inspection of the site, and his [or her] general experience, if any, as a contractor in the area.

*Id.* at 410.

Similar reasoning applies in the instant case. Inasmuch as there is no genuine issue of material fact as to the conditions as found upon drilling, we can interpret the terms of the changed conditions clause as a matter of law. *See Acoba,* 92 Hawai'i at 10, 986 P.2d at 297 (summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law"). As noted, the physical condition "must be one

that could not be reasonably anticipated," *Perini Corp.*, 381 F.2d at 410, based on all the information available.[19] As to the depth and character of the basalt layer, the contract documents were plain that the work would entail all shaft excavation, whether the material was "soil, rock, weathered rock, stone, natural or man-made obstructions, or materials of other descriptions." The unit price was designated as "full compensation for all costs of excavating below the bottom of the shaft elevations shown on the plans." The boring information provided by the State demonstrated that the basalt layer was found at varying elevations. As stated earlier, the uncontested findings also demonstrate that Foundation's president knew before bidding upon the contract, based upon the boring logs, that the basalt layer could be discovered at higher then expected levels. In light of the contract terms, the alleged increase in drilling through the basalt layer would not constitute a material difference justifying the application of the differing site conditions clause.

## IX.

As to Foundation's final argument on appeal, it argues that a conversation between Judge Mossman and the State's deputy attorney general, Mr. Rosenzweig, was an improper *ex parte* communication, and thus Judge Mossman was required to recuse himself from this case. As stated earlier, Judge Mossman called Mr. Rosenzweig to discuss the contents of a conclusion of law drafted by Mr. Rosenzweig.

The Code of Judicial Conduct (CJC) Canon 3(B)(7) (1996) states that a "judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding[.]"[20] This cannon, however, provides for certain exceptions. Relevant to this case, Canon 3(B)(7)(a) states that

[w]here circumstances require, ex parte communications for *scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized;* provided:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and

(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

(Emphasis added.)

It has been held that communications regarding the content of orders would be vacated only if the process used by the judge was "fundamentally unfair." *See In re Colony Square Co.*, 819 F.2d 272, 276 (11th Cir.1987) ("orders [drafted by a party litigant] will be vacated only if a party can demonstrate that the process by which the judge arrived at them was fundamentally unfair"); *see also Margoles v. Johns*, 660 F.2d 291, 296 (7th Cir.1981) ("A litigant is denied the fundamental fairness to which he [or she] is constitutionally entitled if the judge of his [or her] case is unfairly biased against him [or her and] ... is denied due process if he [or she] is in fact treated unfairly."), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982).

In the instant case, it seems evident that the intent and content of the telephone conversation was of administrative or "housekeeping" concern and entailed only the proposed order Mr. Rosenzweig had circulated to the parties.[21] Mr. Rosenzweig was not

---

**19.** We note that the plans stated that any measurements were estimates only. The State argues that the boring logs demonstrated that the basalt layer was found at varying heights, and, thus, Foundation had no basis to rely solely upon the project plans.

**20.** Foundation previously argued that HRS § 601–7 (1993) provided a second, independent ground for disqualification in this case. HRS § 601–7 provides for disqualification where a judge "has a personal bias or prejudice either against the party or in favor of any opposite party[.]" However, Foundation has chosen not to argue this point as it believes "Canon (3)(B)(7) [sic] is the stricter standard for recusal."

**21.** Although not necessary for the purposes of this disposition, the State maintains that because Judge Mossman had already orally made his ruling, the case was not a "pending or impending proceeding" as envisioned by Canon 3(B)(7). In *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1164 (5th Cir.1988), the Fifth Circuit Court de-

present at the September 6, 1996 hearing when the relevant portion of conclusion G was brought to Judge Mossman's attention by Foundation's counsel. It is apparent from the record that Judge Mossman sought to clarify the reasons for his ruling, and the purpose of the phone call was to instruct Mr. Rosenzweig to delete the sentence from the proposed order. Although this is a practice to be avoided, it would not appear that to a reasonable onlooker the telephone conversation was prejudicial, providing the State with an advantage or depriving Foundation of the opportunity to argue its case. This court has "adopt[ed] the abuse of discretion standard for reviewing a judge's denial of a motion for recusal or disqualification." *State v. Ross,* 89 Hawai'i 371, 375–76, 974 P.2d 11, 15–16 (1998). Accordingly, we hold that there was no abuse of discretion in the December 4, 1996 denial of the motion to recuse.

## X.

Based on the foregoing, we affirm the court's October 1, 1996 order granting summary judgment in favor of the State and Ige and denying Foundation's motion for summary judgment, the October 21, 1996 order granting summary judgment in favor of Miyamoto, and the March 9, 1998 final judgment.

---

termined that "[t]he matter was no longer pending for purposes of these provisions prohibiting ex parte contacts between counsel for a party and a judge in whose court that party's case is pending[,]" because the bankruptcy judge had orally confirmed the bankruptcy plan at a prior hearing, during which the party's objections had been "vigorously presented[.]" *Id.* Such is the case here, as Foundation was able to, and did, present its objections to conclusion G during the September 6, 1996 hearing.