145 P.3d 738

Sue Sun Won WITTIG, And As To Some Claims, On Behalf of the Class of Other Similarly Situated, Plaintiff–Appellant,

v.

ALLIANZ, A.G.,; Fireman's Fund, and Nelson B. Befitel, Director, Department of Labor, State of Hawai'i, Defendants–Appellees,

and

John Doe 1–10, et al., Defendants.

No. 26227.

Intermediate Court of Appeals of Hawai'i.

June 26, 2006.

As Corrected July 3, 2006.

Stephen M. Shaw, on the briefs, for Plaintiff–Appellant.

Richard F. Nakamura, Steven L. Goto, (Ayabe, Chong, Nishimoto, Associate Judge Sia & Nakamura), on the briefs, Honolulu, for Defendants–Appellees.

LIM, Acting C.J., FOLEY, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

In this case, a workers' compensation insurer made an offer to settle a workers' compensation claim on terms that included the employee's resignation. The employee sued, alleging bad faith on the part of the insurer. We hold that the insurer's inclusion of a resignation term in its settlement offer did not constitute bad faith *per se*. We further hold that summary judgment in favor of the insurer was proper because the evidence proffered by the employee did not support her allegations of insurer bad faith.

Plaintiff–Appellant Sue Sun Won Wittig (Wittig or Plaintiff) appeals from the Judgment entered in favor of Defendant–Appellee Fireman's Fund Insurance Co. (Fireman's Fund) on November 10, 2003, in the Circuit Court of the First Circuit (the circuit court).[1] The Judgment was entered pursuant to the

circuit court's findings of fact, conclusions of law, and order which denied Wittig's motion for summary judgment and granted Fireman's Fund's cross-motion for summary judgment.

On January 29, 2003, Wittig filed a "Complaint in Tort for Insurer Bad Faith" (the Complaint), naming as defendants: Allianz, A.G. (Allianz), Fireman's Fund, Nelson B. Befitel, in his capacity as the Director of the Department of Labor and Industrial Relations (DLIR) of the State of Hawai'i, and various Doe individuals and entities.[2] The Complaint arose out of a workers' compensation claim filed by Wittig against her employer, Grace Business Development Corporation (GBDC), and GBDC's workers' compensation insurer, Fireman's Fund (collectively referred to as the "Employer/Carrier"). Fireman's Fund had offered to settle Wittig's workers' compensation claim on terms that required Wittig to resign her employment in exchange for payment of additional consideration. Wittig alleged that Fireman's Fund's offer was improper and constituted bad faith.

The parties stipulated to the dismissal of Allianz and the Director of the DLIR from the lawsuit with prejudice. Wittig moved for summary judgment against Fireman's Fund, and Fireman's Fund countered with a cross-motion for summary judgment against Wittig. The focus of the competing motions for summary judgment was on whether Fireman's Fund's offer to settle Wittig's workers' compensation claim constituted bad faith as a matter of law. On September 3, 2003, the circuit court denied Wittig's motion for summary judgment and granted summary judgment in favor of Fireman's Fund on all claims and causes of action filed against Fireman's Fund.

On appeal, Wittig argues that the circuit court erred in granting Fireman's Fund's

---

1. The Honorable Richard W. Pollack presided.

2. Plaintiff–Appellant Sue Sun Won Wittig (Wittig or Plaintiff) alleged the following causes of action in her "Complaint in Tort for Insurer Bad Faith" (the Complaint):
 Count 1 Breach of the implied covenant of good faith and fair dealing;
 Count 2 Class action for declaratory relief;

Count 3 Class action for injunction;
Count 4 Reckless supervision or hiring of employees or subsidiaries;
Count 5 Civil conspiracy;
Count 6 Negligence (alternative); and
Count 7 Declaratory judgment against Nelson S. Befitel as Director of the Department of Labor and Industrial Relations.

cross-motion for summary judgment and in denying her motion for summary judgment. For the reasons set forth below, we affirm the circuit court's Judgment.

## BACKGROUND

Wittig was employed as a housekeeper for GBDC. On April 13, 1998, Wittig reported injuring her left knee by hitting it on a refrigerator as she stepped down from a chair while dusting a picture frame. On September 7, 2000, following a contested case hearing before the Department of Labor and Industrial Relations Disability Compensation Division (DLIR–DCD), the Director of the DLIR awarded Wittig benefits for temporary total disability (TTD), permanent partial disability (PPD), disfigurement, and reasonable medical care as a result of her left knee injury. GBDC and Fireman's Fund paid the awarded benefits which totaled $16,287.05.

On January 30, 2000, Wittig reported that while vacuuming the floor, she caught her foot in the electrical cord and fell on her right shoulder and back. She sustained injuries to her neck, shoulder, upper and lower back, hip, wrist, and buttock. On the day of the accident, Wittig went to the emergency room at Pali Momi Hospital. She was later treated by Terry Vernoy, M.D. (Dr. Vernoy), an orthopedic surgeon, who had been treating Wittig for her 1998 knee injury. Wittig did not return to work until March 2000, at which time she resumed work on a reduced schedule, cleaning less rooms per day.

Wittig was referred to Robert L. Smith, M.D. (Dr. Smith), for an independent medical evaluation (IME). In his July 25, 2000, evaluation, Dr. Smith opined that Wittig's complaints were suggestive of psychosocial stresses and that on a physical basis, there was nothing to preclude her from returning to work full-time. Wittig was next referred to James R. Langworthy, M.D. (Dr. Langworthy), for an IME. In his November 30, 2000, report, Dr. Langworthy diagnosed Wittig as having: 1) chronic low back pain with early degenerative disc disease; and 2) De Quervain's tenosynovitis of the right wrist. Dr. Langworthy concluded that Wittig was medically stable and rated her as having a 5 percent impairment of the person for the low back injury and a 2 percent impairment of the upper extremity for the right wrist injury.

Based in part on Dr. Langworthy's disability assessment, Fireman's Fund extended a settlement proposal to Wittig by a letter to her dated October 17, 2001, which provided in relevant part as follows:

As you are aware, we had submitted you for an evaluation with Dr. James Langworthy. A copy is provided for your review.... We would like to extend a settlement proposal as noted below:

Proposal:

| | |
|---|---|
| 5% PPD Back (WM) | - $ 8252.40 |
| 3% subjectives | - $ 4951.44 |
| 2% PPD Right Arm | - $ 3300.96 |
| Waivers | - $ 15000.00 |
| Total | - $ 31504.80 |

The total amount of $31,504.00 would be for closure of your entire workers' compensation claim *and request for your resignation with your employer.*

We request that you contact our office to discuss this matter further and we will explain all the details. Thereafter, should you be in agreement, the appropriate documents will be prepared.

(Emphasis added.)

Wittig did not respond to Fireman's Fund's settlement proposal. A hearing was scheduled for July 10, 2002, before the DLIR–DCD to determine the extent of Wittig's permanent impairment. On March 4, 2002, Wittig submitted to a second evaluation by Dr. Langworthy, who reassessed her condition and increased her PPD rating to 8 percent impairment of the whole body for her back injury and 2 percent impairment of the upper extremity for her wrist injury.

From the time of the January 30, 2000, accident through June 2002, Fireman's Fund appears to have paid for Wittig's medical treatment with Dr. Vernoy. On June 25, 2002, Fireman's Fund informed Wittig that it would not pay for Dr. Vernoy's medical services because his June 1, 2002, treatment plan was deficient. Thereafter, Fireman's Fund continued to deny payment for medical services rendered by Dr. Vernoy based on alleged deficiencies in his treatment plans.

On July 10, 2002, Wittig's counsel notified the Director of the DLIR and Fireman's Fund that counsel had been retained by Wittig the previous day. The parties stipulated to a continuance of the July 10, 2002, hearing before the DLIR–DCD. Wittig submitted to a second IME by Dr. Smith, who sent his report to Fireman's Fund on November 8, 2002. Dr. Smith diagnosed Wittig's injury as a contusion of the left buttock, which should have resolved within six weeks of the accident, and rated her as 0 percent impairment of the whole person. Dr. Smith characterized Wittig's claimed symptoms as psychogenic (arising in her mind) and not based on her physiological condition.

On November 29, 2002, thirteen months after Fireman's Fund had extended its settlement proposal, Wittig's counsel sent a letter to Fireman's Fund inquiring about some of the terms contained in Fireman's Fund's proposal. The letter from Wittig's counsel stated in relevant part as follows:

In order that I may evaluate Fireman's Fund's offer, please provide the following information within *fourteen (14) days* relating to what Fireman's referred in the 10/17/01 offer (¶ 4) as "all the details" or "the appropriate documents":

1. will Fireman's Fund require, as a condition of settlement of the claim it referred to in its proposal of 10/12/01 [sic], the inclusion of Fireman's Fund as an entity or party to be released from liability?

2. if the answer to the above question is other than "no", is Fireman's Fund offering *any* sum of money to be released? If so, is this *in addition* to the $31,504.80 Fireman's fund proposed on 10/17/01?

The attorney for Fireman's Fund wrote a letter dated December 6, 2002, to Wittig's counsel which acknowledged the receipt of his November 29, 2002, letter but did not specifically address the questions he posed. Rather, the letter from the attorney for Fireman's Fund advised Wittig's counsel:

At this time, my clients are inclined to have the hearing which was continued on July 10, 2002 rescheduled. However, if Ms. Wittig has a settlement proposal at this time, please forward it to me and I will discuss it with my clients.

The record indicates that when the attorney for Fireman's Fund wrote his December 6, 2002, letter, he knew that Wittig's counsel, in September of 2002, had filed a complaint against Fireman's Fund with the Insurance Division of the State Department of Commerce and Consumer Affairs. In that complaint, Wittig's counsel alleged that Fireman's Fund had engaged in unfair settlement practices with respect to Wittig's workers' compensation claim. Wittig's counsel also made related complaints against Fireman's Fund to the Federal Bureau of Investigation in December 2002 and to the Director of the DLIR in January 2003.

Wittig did not make any counteroffers requesting settlement of her workers' compensation claim on different terms. Instead, on January 29, 2003, Wittig filed the Complaint in circuit court alleging insurer bad faith. In the meantime, Wittig and Fireman's Fund continued to pursue Wittig's workers' compensation claim before the DLIR–DCD. On March 13, 2003, the DLIR–DCD held a hearing on Wittig's claim for her January 30, 2000, accident. On April 21, 2003, the Director of the DLIR issued his decision which determined that Wittig was entitled to an award of: 1) PPD benefits totaling $25,328.52 based on a 13 percent PPD of the whole person for her back condition and a 3 percent PPD of the right upper extremity for her wrist injury; and 2) TTD benefits totaling $1,410.75 for the five weeks following the accident during which she had been temporarily totally disabled. The Director further determined that although Dr. Vernoy's treatment plans may have been technically deficient, they were sufficient to comply with the administrative rules. The Director ordered GBDC to pay for medical treatments provided under the treatment plans between June 1, 2002 and February 22, 2003, except for a one-month period which was excluded due to the late submission of a treatment plan. Apparently, neither side appealed the Director's decision. Fireman's Fund promptly paid the amounts owed to Wittig under the Director's decision.

## DISCUSSION

### I.

■ "We review the circuit court's grant or denial of summary judgment *de novo*," *Querubin v. Thronas,* 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005), using the same standard applicable to the circuit court. *Iddings v. Mee–Lee,* 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c).

Once the moving party has satisfied its initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law, the opposing party "may not rest upon the mere allegations or denials of [the opposing party's] pleading" but must come forward, through affidavit or other evidence, with "specific facts showing that there is a genuine issue for trial." HRCP Rule 56(e). If the opposing party fails to respond in this fashion, the moving party is entitled to summary judgment as a matter of law. *Hall v. State,* 7 Haw.App. 274, 284, 756 P.2d 1048, 1055 (1988); *see also* HRCP 56(e).

The Hawai'i Supreme Court has explained the moving party's burden of demonstrating its entitlement to summary judgment as follows:

A summary judgment motion challenges the very existence or legal sufficiency of the claim or defense to which it is addressed. In effect the moving party takes the position that he is entitled to prevail ... because his opponent has no valid claim for relief or defense to the action, as the case may be. He thus has the burden of demonstrating that there is no genuine issue as to any material fact relative to the claim or defense and he is entitled to judgment as a matter of law.

He may discharge his burden by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his opponent. For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless....

*First Hawaiian Bank v. Weeks,* 70 Haw. 392, 396–97, 772 P.2d 1187, 1190 (1989) (quotation marks, brackets, and citations omitted).

The United States Supreme Court, in construing Federal Rules of Civil Procedure (FRCP) Rule 56(c), on which HRCP Rule 56(c) is modeled, has similarly stated:

In our view, the plain language of [FRCP] Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. The standard for granting summary judgment mirrors the standard for a directed verdict under [FRCP Rule] 50(a)....

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation marks and brackets omitted); *see, e.g., Wagatsuma v. Patch,* 10 Haw.App. 547, 562, 879 P.2d 572, 582 (1994) (noting that, for purposes of judicial review, "[s]ummary judgment is analogous to a directed verdict").

### II.

■ A workers' compensation insurance carrier has a duty to act in good faith in dealing with workers' compensation claimants, and a breach of this duty gives rise to a cause of action in tort for insurer bad faith. *Hough v. Pacific Ins. Co., Ltd.,* 83 Hawai'i 457, 468–69, 927 P.2d 858, 869–70 (1996). A reasonableness standard governs bad faith claims. *See The Best Place, Inc. v. Penn Am. Ins. Co.,* 82 Hawai'i 120, 133, 920 P.2d

334, 347 (1996). Ordinarily, the question of the reasonableness of a party's conduct is not susceptible to adjudication on summary judgment. *See Pickering v. State*, 57 Haw. 405, 407, 557 P.2d 125, 127 (1976); *De Los Santos v. State*, 65 Haw. 608, 610–11, 655 P.2d 869, 871 (1982). However, the trial court is "under a duty" to decide this question as a matter of law "where the facts are undisputed or are susceptible of only one reasonable interpretation." *De Los Santos*, 65 Haw. at 610–11, 655 P.2d at 871 (stating that this principle applies to the question of negligence or proximate cause); *Cordeiro v. Burns*, 7 Haw.App. 463, 466, 776 P.2d 411, 414 (1989) (same).

In ruling on the parties' competing motions for summary judgment, the circuit court identified five allegations on which Wittig's lawsuit against Fireman's Fund was based. Wittig's arguments on appeal attack only the circuit court's resolution of three of the five allegations. We therefore confine our attention to these three allegations, which the circuit court identified as follows:

1. Fireman's Fund refused to settle Plaintiff's insurance claim unless she agreed to quit her job.
2. Fireman's Fund refused to settle the claim unless Plaintiff agreed to release Fireman's Fund from liability (apparently tort liability).
3. Fireman's Fund failed to timely respond as required by statute to a communication of Plaintiff, thereby not negotiating in good faith.

The factual circumstances underlying Wittig's allegations were not disputed. These circumstances were:

1. By letter dated October 17, 2001, Fireman's Fund submitted a settlement offer to Wittig "for closure of [her] entire worker's compensation claim," which included a "request for [her] resignation with [her] employer."
2. Wittig did not respond to this offer for thirteen months.
3. Wittig's counsel sent a letter to Fireman's Fund on November 29, 2002, asking questions about the terms of its offer, namely: a) whether as a condition of the offer Fireman's Fund required that it be included as a party to be released from liability; and b) if so, whether Fireman's Fund was offering any sum of money to be released that was in addition to the $31,504.80 stated in the offer.
4. Fireman's Fund acknowledged its receipt of the November 29, 2002, letter from Wittig's counsel but did not answer the questions contained in that letter.

While not disputing these underlying facts, Wittig and Fireman's Fund, in their respective motions for summary judgment, differed over how Fireman's Fund's settlement offer and the subsequent correspondence between the parties should be interpreted.

 Settlement offers are interpreted according to contract law principles. *Collins v. South Seas Jeep Eagle*, 87 Hawai'i 86, 90, 952 P.2d 374, 378 (1997); *Standard Mgmt., Inc. v. Kekona*, 99 Hawai'i 125, 133–134, 53 P.3d 264, 272–273 (App.2001). Where the terms of a contract are ambiguous, the ambiguity raises the question of the parties' intent, which is a question of fact that will often render summary judgment inappropriate. *Found. Int'l, Inc. v. E.T. Ige Construction, Inc.*, 102 Hawai'i 487, 497, 78 P.3d 23, 33 (2003); *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1145 (1984). If the language of a contract is unambiguous, however, the interpretation of the contract presents a question of law to be decided by the court. *Found. Int'l, Inc.*, 102 Hawai'i at 497, 78 P.3d at 33; *United States v. 0.35 Of An Acre Of Land*, 706 F.Supp. 1064, 1070 (S.D.N.Y.1988).

 In addition, the determination of whether a contract contains ambiguous terms is a threshold question of law for the court to decide. *Found. Int'l, Inc.*, 102 Hawai'i at 496, 78 P.3d at 32; *0.35 Of An Acre Of Land*, 706 F.Supp. at 1070. A contract term or phrase is ambiguous only if it is capable of being reasonably understood in more than one way. *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 73 Haw. 509, 520, 836 P.2d 1057, 1063–64 (1992). The parties' disagreement over the meaning of a contract's terms does not render clear language ambiguous. *Found. Int'l, Inc.*, 102 Hawai'i at 497, 78 P.3d at 33. "Nor does ambiguity exist where one

party's view strains the contract language beyond its reasonable and ordinary meaning." *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (quotation marks and brackets omitted). Under the parol evidence rule, the court may not resort to extrinsic evidence to determine the parties' intent where the contract's language is unambiguous. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 124–25, 839 P.2d 10, 31 (1992).

### III.

Wittig's main argument on appeal is that the circuit court erred in "refusing to find" that Fireman's Fund's settlement offer, by its very terms, was unreasonable and established its bad faith. Fireman's Fund refers to its settlement offer to Wittig as a "full wash/waiver" and explained the offer in its summary judgment motion as follows:

Based on Dr. Langworthy's medical opinion, Employer/Carrier offered to settle Plaintiff's workers' compensation claim for 5% PPD (low back) and 2% PPD (right arm), plus an *additional* 3% PPD for "subjective" pain above what was rated by Dr. Langworthy. Employer/Carrier further offered to settle Plaintiff's "entire" claim, *i.e.,* Plaintiff's rights under Chapter 386, to further medical, vocational rehabilitation, and reopening (in case of aggravation or worsening of Plaintiff's injuries requiring additional temporary, permanent or medical benefits) benefits, among others.

Inasmuch as Plaintiff would be foregoing her future rights, Employer/Carrier offered Plaintiff an additional consideration of $15,000 for the "full wash" settlement, above and beyond its liability for permanent indemnity benefits under Section 386–32. Because the Plaintiff had not been cleared for full duty work without limitations, and because of the potential that Plaintiff might get further injured—or claim a further injury based on a worsening or aggravation of her existing permanent disability—in which case Employer/Carrier would *again* be responsible for medical and indemnity benefits for injuries to the *same* body parts, despite its payment of additional consideration to "wash"

those claims, Employer/Carrier required that Plaintiff resign her employment as a condition of receiving the additional consideration.

(Citations omitted).

Wittig contends that a settlement offer that is conditioned on a claimant's resignation from employment violates public policy and amounts to a retaliatory discharge for the claimant's having filed a workers' compensation claim. She therefore argues that Fireman's Fund's settlement offer constituted bad faith *per se.*

In rejecting Wittig's argument, the circuit court made the following findings:

5. ... Plaintiff's contention that the October 17, 2001, settlement proposal on its face violates Section 386–142, Hawaii Revised Statutes, and therefore constitutes bad faith, is flawed on at least two grounds: (a) Section 386–142, HRS, provides that it is unlawful for an employer to suspend or discharge any employee solely because of a compensable work injury, except under certain conditions. The statute does not prohibit, or even address, the situation where an employee chooses to resign because of a financial settlement made with the employer's insurer; and (b) Neither the October 17, 2001 resignation proposal, nor the offer to settle the compensation claim on a "full wash" basis is in any way illegal or improper based on the circumstances before the Court. Fireman's Fund offered to settle Plaintiff's entire claim, *i.e.,* Plaintiff's rights under Chapter 386 to further medical, vocational, and potential reopening of the claim in the event of aggravation of Plaintiff's injuries requiring additional temporary, permanent or medical benefits. In exchange for the relinquishment of these rights, Fireman's Fund offered Plaintiff an additional $15,000 for a "full wash" settlement, which included the condition that Plaintiff resign her employment. As a matter of public policy, settlements are to be encouraged and to arbitrarily conclude that certain provisions relating to an employee's continuation in employment may not be included in a voluntary settlement agreement between the parties would adversely restrict

the parties' ability to enter into settlement agreements, as recognized by the District of Columbia Appellate court in *Dominique v. District of Columbia Department of Employment Services*, 574 A.2d 862 (D.C.App.1990). Here, no argument has been made by Plaintiff that there was no legitimate reason for Fireman's Fund to propose such a settlement condition. Indeed, Plaintiff did not raise illegitimacy of the settlement offer in her November 29, 2002, letter, instead seeking only clarification of the terms of the offer. The record clearly shows that legitimate reasons were present, in light of Plaintiff's inability to return to full-time duty and the nature of the injury involved.

6. The Court rejects the *per se* notion that a workers' compensation insurer's settlement proposal may not include a term that the employee resign from employment. At a minimum, there is nothing in the record before the Court that would indicate that Fireman's Fund's settlement proposal, to which Plaintiff did not make a counteroffer, violated the law.

7. The record does not support a finding that Fireman's Fund acted in bad faith in submitting its October 17, 2001, settlement proposal to Plaintiff, which included as a term that Plaintiff resign from her employment for the financial amount offered.

 We agree with the circuit court that Fireman's Fund's settlement offer did not violate public policy or amount to an unlawful retaliatory discharge by including Wittig's resignation as one of its terms. As in other jurisdictions, Hawai'i has a public policy supporting the resolution of disputes through settlement agreements. *Amantiad v. Odum*, 90 Hawai'i 152, 161–62, 977 P.2d 160, 169–70 (1999). There is nothing inherently wrong with a voluntary settlement agreement that includes the employee's resignation as a condition, particularly where the employee is offered additional compensation for resigning. A settlement on such terms may be attractive to the employee and serve the employee's interests. Wittig's counsel conceded as much during the hearing on the summary judgment motions. When

Wittig's counsel was asked by the circuit court whether counsel thought "we'd be here today" if Fireman's Fund had offered Wittig $250,000 to resign, Wittig's counsel replied, "No, I don't."

Workers' compensation settlements that include an employee's resignation are not uncommon. *See, e.g., Whitt v. Race Fork Coal Corp.*, 18 Va.App. 71, 441 S.E.2d 357, 358 (1994); *Edward v. Sentinel Mgmt. Co.*, 611 N.W.2d 366, 367 (Minn.Ct.App.2000); *Hill v. Terminix*, 617 F.Supp. 1030, 1031 (E.D.Mich.1985). Instead of violating public policy, permitting a settlement offer to include an employee's resignation expands the opportunity for settlement and advances the public policy favoring dispute resolution through voluntary settlement agreements. *See Dominique v. Dist. of Columbia Dep't of Employment Services*, 574 A.2d 862, 865–66 (D.C.1990). If a settlement offer which includes the employee's resignation as a condition constitutes bad faith *per se*, no employer or insurer could make such an offer. A blanket prohibition against settlement offers that include the employee's resignation would unduly restrict the parties' ability to enter into voluntary settlements on terms that are mutually beneficial.

 We also reject Wittig's assertion that Fireman's Fund's including her resignation as a condition of its settlement offer had a coercive effect which amounted to a retaliatory discharge. In the circuit court, Wittig relied on HRS § 386–142 (1993) as support for her retaliatory discharge claim. On appeal, however, she relies on HRS § 378–32(2) (1993). The two statutes overlap in significant respects. Both statutes make it unlawful for an employer to suspend or discharge an employee "solely because" the employee has suffered a work injury, unless certain conditions are met. HRS §§ 378–32(2) and 386–142.

 Wittig was not suspended or discharged from her position with GBDC. Fireman's Fund's mere tender of a settlement offer containing a resignation term, which Wittig was free to reject, did not constitute an unlawful retaliatory discharge or suspension. We decline to consider Wittig's arguments to the extent that HRS § 378–32(2) is

broader than HRS § 386–142. Wittig waived those arguments by not raising HRS § 378–32(2) in the court below.[3] *See State v. Ildefonso,* 72 Haw. 573, 584, 827 P.2d 648, 655 (1992); *State v. Hoglund,* 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990).

We fail to see how Fireman's Fund's inclusion of the resignation term in its settlement offer was coercive. Wittig was not forced to accept Fireman's Fund's offer. She had the option of declining to accept the offer and pursuing her claim for benefits before the Director of the DLIR, which is precisely the option she chose.

We note that under HRS § 386–78 (Supp. 2005), any settlement agreement regarding a workers' compensation claim pending before the Director of the DLIR is subject to approval by the Director. This provides an additional safeguard against possible overreaching by an employer or insurance carrier in settling a workers' compensation claim.

### IV.

■ The circuit court properly rejected Wittig's allegation that Fireman's Fund had refused to settle Wittig's insurance claim unless she agreed to quit her job. The circuit court found in relevant part that:

1. The October 17, 2001 settlement proposal on its face does not indicate that Fireman's Fund would not consider a counterproposal, including, for example, a counterproposal removing the condition of Plaintiff's resignation from employment;

. . . .

3. Plaintiff's allegation that Fireman's Fund's settlement proposal excluded the ability of Plaintiff to make a counteroffer to remove the resignation term is not supported by the evidence.

4. The Court finds as a matter of law that the October 17, 2001, letter may not be read to exclude the making of a counteroffer, including the deletion or modifying of any term in the October 17, 2001 settlement proposal.

We agree with the circuit court's interpretation of Fireman's Fund's October 17, 2001, settlement offer. On its face, the offer simply identified certain terms under which Fireman's Fund would be willing to settle Wittig's workers' compensation claim; it did not preclude Wittig from making a counteroffer proposing different terms or suggest that Wittig's resignation was a non-negotiable condition of any settlement. Accordingly, as a matter of law, Fireman's Fund's settlement offer did not substantiate Wittig's allegation that Fireman's Fund refused to settle her insurance claim unless she agreed to quit her job. *See Found. Int'l, Inc.,* 102 Hawai'i at 497, 78 P.3d at 33 (concluding that the court decides the interpretation of unambiguous contract terms as a matter of law); *0.35 Of An Acre Of Land,* 706 F.Supp. at 1070 (same).

The circuit court also properly rejected Wittig's allegation that Fireman's Fund refused to settle her claim unless she agreed to release Fireman's Fund from tort liability. With respect to this allegation, the circuit court found that:

8. Plaintiff's assertion that the October 17, 2001, settlement proposal was "improper, unreasonable and extortionate" by not offering any consideration for the release of the insurer's own tort liabilities is not supported by the record.

9. The October 17, 2001, settlement proposal does not use the word "release". It simply states that the amount offered would be for closure of the entire workers' compensation claim. Closure of a workers' compensation claim is not the equivalent of a release of bad faith claim. Although Plaintiff ultimately sought clarification of this provision, Fireman's Fund did not respond. Thus, Plaintiff's assertion that the settlement proposal improperly required a release of tort claims is not supported by the record.

---

**3.** Hawaii Revised Statutes (HRS) § 378–32(2) (1993) is broader than HRS § 386–142 (1993) because HRS § 378–32(2) also makes it unlawful for an employer to "discriminate against" an employee solely because the employee suffered a work injury, unless certain conditions are met.

Wittig did not argue in the court below that the settlement offer of Defendant–Appellee Fireman's Fund Insurance Co. (Fireman's Fund) violated HRS § 378–32(2)'s prohibition against discrimination. Nor did Wittig produce any evidence that would have supported such an argument.

■ We agree with the circuit court that Fireman's Fund's settlement offer cannot reasonably be interpreted as requiring Wittig to release Fireman's Fund from tort liability. The settlement offer simply states that the amount offered "would be for closure of your entire workers' compensation claim." An insurer's tort liability for bad faith is separate from its liability for a workers' compensation claim. *Hough,* 83 Hawai'i at 464–67, 927 P.2d at 865–68. In addition, the offer invites Wittig to contact Fireman's Fund to "discuss this matter further" so that Fireman's Fund could "explain all the details." As a matter of law, the settlement offer did not support Wittig's allegation that Fireman's Fund refused to settle her claim unless she agreed to release it from tort liability.

## V.

In a circuit court pleading filed before the motions for summary judgment, Fireman's Fund described its full wash/waiver settlement offer to Wittig.[4] Then, in a footnote, Fireman's Fund explained its justification for certain of the terms included in the full wash/waiver settlement offer, as follows:

> In the parlance of local practitioners before the Department of Labor and Industrial Relations, Disability Compensation Division, this is commonly known as a "full wash/waiver." Because an Employer and its workers' compensation insurer are defined under state law as having the same rights and liabilities, *see* Haw.Rev.Stat. § 386–1 (Spec.Pamph.1999), any settlement with the workers' compensation claimant needs to release both the Employer and its workers' compensation insurer. Further, because of the potential that a claimant could file a new claim for the same injury, the employee is required to resign his/her employment as a condition of the settlement of future liabilities.

Wittig contends that this footnote was an "admission" by Fireman's Fund that it had a practice, which it followed in Wittig's case, of refusing to settle workers' compensation claims unless the employee agreed to resign and to release Fireman's Fund from tort liability. We disagree with Wittig's contention. The footnote simply explained why an employee's resignation was a required term of a *full wash/waiver settlement.* The footnote did not indicate that Fireman's Fund refused to consider other types of settlements or that Fireman's Fund would only consider settling a workers' compensation claim if the employee resigned. In addition, when read in context, the type of release referred to in the footnote was plainly the release of an insurer's liability under the workers' compensation statute and not the release of an insurer's liability in tort.

■ An opposing party may not avert summary judgment by urging an unreasonable interpretation of, or drawing an illogical inference from, undisputed evidence. *See Wong v. Panis,* 7 Haw.App. 414, 418, 772 P.2d 695, 699 (1989) ("The inferences drawn from the evidence [on a motion for summary judgment] must be logical and reasonable."), *abrogated in part on other grounds by Hac v. Univ. of Hawaii,* 102 Hawai'i 92, 73 P.3d 46 (2003); *see also Cordeiro,* 7 Haw.App. at 466, 776 P.2d at 414 (affirming the trial court's grant of summary judgment because the facts were susceptible to only one reasonable interpretation); *Kang v. Charles Pankow Assocs.,* 5 Haw.App. 1, 7, 675 P.2d 803, 807–08 (1984) (same). Fireman's Fund's footnote cannot reasonably be interpreted as an "admission" of Wittig's allegations that Fireman's Fund refused to settle her workers' compensation claim unless she agreed to quit her job and release Fireman's Fund from tort liability. The strained and unreasonable inferences Wittig attempted to draw from this footnote did not create a genuine issue of material fact regarding her allegations.

## VI.

■ The circuit court properly rejected Wittig's allegation that Fireman's Fund

---

4. In particular, Fireman's Fund noted that as part of its full wash/waiver settlement offer, it offered to pay Wittig an additional $15,000 over and above her permanent partial disability rating in order to foreclose future claims by Wittig against her employer or Fireman's Fund for medical, indemnity, vocational rehabilitation, and reopening benefits under the workers' compensation statutes, HRS Chapter 386, and the related administrative rules.

breached its duty to negotiate in good faith by failing to respond to the questions posed in her counsel's November 29, 2002, letter. The circuit court rejected this allegation as follows:

10. Plaintiff's contention that Fireman's Fund engaged in bad faith conduct by failing to comply with Section 431:13–103(a)(11)(B), which requires an insurer to timely respond to an inquiry by its insured, is not supported by the record. Said statute provides that an insurer engages in unfair settlement practices by committing or performing [sic] such frequency as to indicate a general business practice of any of several activities, including failing to respond with reasonable promptness, defined as no more than 15 working days, [sic] communications from the insured.

11. While Plaintiff's Complaint alleged that Fireman's Fund engaged in such conduct as a frequent business practice, there is no evidence before the Court that Fireman's Fund did in fact engage in a general business practice of not responding to communications from their insureds within 15 days. The only evidence before the Court is that Fireman's Fund did not respond to Plaintiff's counsel's November 29, 2002, letter. The failure to respond to one letter does not provide sufficient evidence to demonstrate a general business practice. Thus, Plaintiff may not rely on Section 431:13–103, HRS, because no general business practice has been shown.

12. Plaintiff's argument that Fireman's Fund's bad faith is demonstrated by its failure to respond to Plaintiff's November 29, 2002 letter, variously characterized as both a counterproposal and one seeking clarification, is not supported by the evidence.

13. First, the November 29, 2002 letter was written more than 13 months after the settlement proposal had been made by Fireman's Fund, which as a matter of law, may already have expired after the passing of a reasonable time period.

14. Second, the November 29, 2002, letter is by its own terms, not a counterproposal, but rather is one seeking clarification. ("In order that I may evaluate Fireman's offer, please provide the following information.").

15. Third, because the November 29, 2002, letter was not a counterproposal, the nonresponse from Fireman's Fund did not in any way preclude Plaintiff from making a counterproposal. Without more, the policyholder may not seize upon the single nonresponse to the letter seeking clarification of a settlement proposal made 13 months earlier to establish a claim for bad faith. A single nonresponse to a letter seeking clarification 13 months after the offer was made does not demonstrate that Fireman's Fund would not negotiate with Plaintiff or consider a counteroffer.

We agree with the circuit court that Fireman's Fund's non-response to questions posed in the November 29, 2002, letter did not violate HRS § 431:13–103 (2005) or establish a genuine issue of material fact regarding Wittig's allegation that Fireman's Fund breached its duty to negotiate in good faith.[5] HRS § 431:13–103 provides, in relevant part, as follows:

§ 431:13–103 **Unfair methods of competition and unfair or deceptive acts or practices defined.** (a) The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

. . . .

(11) Unfair claim settlement practices. Committing or performing with *such frequency as to indicate a general business practice* any of the following:

. . . .

(B) With respect to claims arising under its policies, failing to respond with reasonable promptness, in no case

---

**5.** There is no private cause of action for violations of HRS § 431:13–103 (2005). *Hough v. Pacific Ins. Co., Ltd.*, 83 Hawai'i 457, 469–70, 927 P.2d 858, 870–71 (1996). The United States District Court for the District of Hawai'i, however, has indicated that violations of HRS § 431:13–103 may nevertheless be used as evidence of insurer bad faith. *Wailua Assocs. v. Aetna Cas. & Sur. Co.*, 27 F.Supp.2d 1211, 1221 (D.Haw.1998).

more than fifteen working days, to communications received from:

(i) The insurer's policyholder;

(ii) Any other persons, including the commissioner; . . .

. . . .

The response shall be more than an acknowledgment that such person's communication has been received, and shall adequately address the concerns stated in the communication;

(Emphasis added.)

The evidence regarding Fireman's Fund's failure to address specifically the questions posed in the November 29, 2002, letter from Wittig's counsel was insufficient to show that Fireman's Fund failed to respond to communications "with such frequency as to indicate a general business practice" under HRS § 431:13–103(a)(11)(B). The context in which Fireman's Fund received the November 29, 2002, letter is important. In that letter, Wittig's counsel was inquiring for the first time about a settlement offer that Fireman's Fund had extended thirteen months earlier. Given the extensive delay, it was reasonable for Fireman's Fund to conclude that its settlement offer had long since expired and that Wittig's counsel was seeking clarification of a settlement offer that was no longer valid. In addition, the record indicates that Fireman's Fund was aware that prior to sending the letter, Wittig's counsel had filed a complaint against Fireman's Fund with the Insurance Division of the State Department of Commerce and Consumer Affairs. Under these circumstances, Fireman's Fund's failure to respond specifically to the questions posed the November 29, 2002, letter did not support Wittig's allegation that Fireman's Fund breached its duty to negotiate in good faith.[6]

6. In the court below, Wittig argued that in addition to the November 29, 2002, letter, Fireman's Fund failed to respond to her counsel's December 17, 2002, letter. The December 17, 2002, letter, however, did not seek a response by Fireman's Fund; instead, it simply announced Wittig's position that Fireman's Fund was in default under HRS § 431:13–103 for failing, in a timely manner, to address adequately the questions posed in Wittig's counsel's November 29, 2002,

**VII.**

Wittig suggests on appeal that Fireman's Fund also breached its duty of good faith and fair dealing because it unreasonably stopped paying for her medical treatment expenses beginning in June 2002. However, Wittig did not raise this issue below. She did not allege that Fireman's Fund's nonpayment of her medical bills constituted bad faith in her complaint, in her pleadings on the motions for summary judgment, or at the hearing on the summary judgment motions. Moreover, the record indicates that Fireman's Fund may have had valid reasons for suspending its payment of Wittig's medical bills. We decline to consider the non-payment issue because "[a]ppellate courts will not consider an issue not raised below unless justice so requires." *Bitney v. Honolulu Police Dept.*, 96 Hawai'i 243, 251, 30 P.3d 257, 265 (2001) (block quote format and brackets omitted); *see State v. Ildefonso*, 72 Haw. at 584–85, 827 P.2d at 655.

**VIII.**

The most obvious deficiency in Wittig's allegations that Fireman's Fund acted in bad faith in refusing to settle her claim stems from her failure to respond to Fireman's Fund's offer. Because Wittig did not make a counteroffer or engage in timely or meaningful negotiations regarding Fireman's Fund's offer, there was no evidence of what terms Fireman's Fund would have insisted on to settle her claim. In particular, Wittig could not produce any evidence that Fireman's Fund rejected settlement proposals that did not require Wittig to resign or that Fireman's Fund demanded to be released from tort liability. Wittig should have at least made a counteroffer or attempted to engage in meaningful settlement discussions before

letter. Assuming *arguendo* that Fireman's Fund was required to respond to the December 17, 2002, letter under HRS § 431:13–103(a)(11)(B), this would not change our conclusion that there was insufficient evidence to show that Fireman's Fund failed to respond to communications "with such frequency as to indicate a general business practice," HRS § 431:13–103(a)(11)(B), or to support Wittig's allegation that Fireman's Fund breached its duty to negotiate in good faith.

208

suing Fireman's Fund for bad faith refusal to settle. Her failure to do so was fatal to her bad faith claims because it left her with nothing more than speculation to support her allegations.

We note that in the context of suits against an insurer for bad faith refusal to settle a third-party claim, courts have concluded that the plaintiff must show that the third-party claimant extended a reasonable settlement offer which the insurer then rejected. *See Vecchione v. Amica Mut. Ins. Co.*, 274 A.D.2d 576, 578, 711 N.Y.S.2d 186 (N.Y.App. Div.2000); *Gainsco Ins. Co. v. Amoco Prod. Co.*, 53 P.3d 1051, 1062 (Wyo.2002); *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 164 Ariz. 256, 792 P.2d 719, 722 (1990) (en banc). Moreover, where a plaintiff seeks to justify the failure to satisfy a condition precedent for filing suit on the ground of futility, courts have required the plaintiff to show clear and positive evidence of futility to avoid summary judgment. *See, e.g., Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419–21 (6th Cir.1998); *Silverman v. City of New Haven*, 19 Conn.App. 360, 562 A.2d 562, 564–65 (1989); *Horton v. Allstate Ins. Co.*, 125 Ill. App.3d 1034, 81 Ill.Dec. 584, 467 N.E.2d 284, 286 (1984).

In support of its cross-motion for summary judgment, Fireman's Fund, among other things, submitted a declaration of its staff counsel, averring that: 1) Wittig had refused the settlement offer made by GBDC/Fireman's Fund, and she did not make a counteroffer; 2) prior to filing suit, Wittig had not proposed settlement on terms different than set forth in GBDC/Fireman's Fund's settlement offer; and 3) GBDC/Fireman's Fund never refused an offer of settlement proposed by Wittig. Wittig did not respond with specific facts contradicting this declaration.

Fireman's Fund established that there was no genuine issue as to any material fact and that it was entitled to judgment as a matter of law. It demonstrated that "if the case went to trial, there would be no competent evidence to support a judgment for [Wittig]," *Weeks*, 70 Haw. at 396, 772 P.2d at 1190 (quotation marks omitted), and that Wittig "failed to make a sufficient showing on an essential element of her case with respect to which she [had] the burden of proof." *Celotex, Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Accordingly, we conclude that the circuit court properly granted Fireman's Fund's cross-motion for summary judgment and denied Wittig's motion for summary judgment.

## CONCLUSION

The Judgment filed on November 10, 2003, in the Circuit Court of the First Circuit is affirmed.

