**Electronically Filed
Supreme Court
SCWC-17-0000453
16-JUN-2021
08:08 AM
Dkt. 19 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

PROVIDENT FUNDING ASSOCIATES, L.P.,
Respondent/Plaintiff-Appellee,

vs.

GISELE M. L. GARDNER, Petitioner/Defendant/Cross-Claim
Plaintiff/Cross-Claim Defendant-Appellant,

and

CITIBANK (SOUTH DAKOTA) N.A., Respondent/Defendant-Appellee,

and

TRAVIS WITTMEYER; KANOA BRISTOL; BLUE WAVE
INVESTMENT SOLUTIONS, LLC, Respondents/Defendants/
Cross-Claim Defendants/Cross-Claim Plaintiffs-Appellees.

SCWC-17-0000453

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000453; CIV. NO. 1CC151002313)

JUNE 16, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, WILSON, AND EDDINS, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

This case requires us to consider the binding effect of a stipulation. The parties to this foreclosure, after summary judgment was entered in favor of the note holder but before sale, entered into a stipulation in which they agreed to postpone the foreclosure auction while they worked to pursue a private sale. No private sale came to pass, and the property sold at auction for less than the parties had hoped a private sale would yield. They now dispute the effect the stipulation should have had on the circuit court proceedings.

We hold that a stipulation made during the course of litigation – reduced to writing, agreed to by all parties, and filed with the court – operates in many respects like a contract and generally binds the parties to its terms. The Circuit Court of the First Circuit (circuit court) and Intermediate Court of Appeals (ICA) therefore erred by failing to treat the stipulation at issue as a binding agreement.

## II. BACKGROUND

### A. Circuit Court Proceedings

#### 1. Dispute and Foreclosure Proceedings

This foreclosure case concerns a property in Waialua. In 2015, Provident Funding Associates, L.P., the note holder,

2

brought a complaint for foreclosure in the circuit court[1] against (as relevant to this appeal) Travis Wittmeyer, Kanoa Bristol, and Blue Wave Investment Solutions, LLC (collectively, the Blue Wave defendants), and Gisele Gardner, the record titleholder of the property and the debtor.  Gardner and the Blue Wave defendants are also parties to another lawsuit (Gardner lawsuit).[2]  It is by virtue of the Gardner lawsuit that Provident Funding named the Blue Wave defendants in the complaint as possible junior interest holders.

       After summary judgment was granted to Provident Funding but before any foreclosure sale, Gardner found a buyer who was willing to purchase the property for $700,000 (a price that would satisfy the debt in full) and entered into a contract with that buyer on April 29, 2016 (April 29, 2016 transaction). However, the Blue Wave defendants thought the property was considerably more valuable and hoped to find a private buyer who

---

[1]     The Honorable Bert I. Ayabe presided until January 2017.  The Honorable Jeannette H. Castagnetti presided thereafter.

[2]     According to the parties' representations in the record of this case (which we offer here solely for context and do not make any suggestion as to their accuracy), the Gardner lawsuit, which is currently pending in the circuit court, Gardner v. Wittmeyer, Civil No. 15-1-0920-05, relates to the same property.  In 2009, Gardner contracted with the Blue Wave defendants to convey the property.  Something went wrong in the conveyance (the parties dispute who was at fault), but the Blue Wave defendants nonetheless took possession of the property, paid what was then due to the bank, and continued to make monthly mortgage payments until October 2014.  At that point, the monthly mortgage payments stopped, although the parties dispute the reason. The mortgage went into default, giving rise to the instant foreclosure action.  Meanwhile, Gardner sued the Blue Wave defendants for, among other things, breach of contract in the Gardner lawsuit, and the Blue Wave defendants filed a counter-claim against Gardner.

3

would pay more than $700,000.

## 2.    The Stipulation

On September 16, 2016, the parties entered into the First Stipulation to Continue Foreclosure Sale and Order (Stipulation).  The Stipulation provided that the foreclosure sale would be continued to October 25, 2016 while the defendants pursued a private sale.  Pursuant to the Stipulation, Gardner and the Blue Wave defendants agreed to try to sell the property to a third-party buyer, but if no other buyer could be found, they agreed to close the April 29, 2016 transaction.  In the event neither the April 29, 2016 transaction nor a sale to a different third-party buyer closed by October 25, 2016, Provident Funding would proceed to a foreclosure sale.

Specifically, the Stipulation provided in relevant part:

> 2.   Gardner, Wittmeyer, Bristol and Blue Wave will cooperate in a good faith effort to sell the property for an amount that will result in a full payoff of the loan owed to Provident Funding ("private sale") and provide Provident Funding with a copy of all fully executed purchase contract(s) within 2 business days of execution for Provident Funding's review and approval;

> 3.   If there is no active purchase contract for the private sale of the property pending as of September 23, 2016 or if a private sale is not closed on or before October 18, 2016 at 5:00pm, Gardner, Wittmeyer, Bristol and Blue Wave agree to proceed in good faith with the transaction presented to Provident Funding by Gardner with a purchase contract reference date of April 29, 2016 ("April 29, 2016 transaction") and cooperate to close the April 29, 2016 transaction promptly to the extent that the Buyer is willing and able to proceed with the transaction and Provident Funding approves the sale;

4

> 4. Gardner, Wittmeyer, Bristol and Blue Wave agree that the Court's Findings of Fact, Conclusions of Law and Order Granting Provident Funding's Motion for Summary Judgment and Decree of Foreclosure, filed on July 28, 2016, shall remain in effect and the Commissioner shall proceed with the preparations for the foreclosure sale to be scheduled for a date on or about October 25, 2016, and the foreclosure sale itself, unless and until the closing of a private sale or the April 29, 2016 transaction resulting in the full payoff of Provident Funding. The Parties agree that the foreclosure sale may proceed at 12:00pm (noon) on October 25, 2016, or anytime thereafter as scheduled by the Commissioner, if neither a private sale nor the April 29, 2016 transaction has closed prior to October 25, 2016 at 12:00pm.

(Emphases added.)

Further, the Stipulation provided that "[i]f a private sale or the April 29, 2016 transaction is consummated, Provident Funding will be paid in full from the sale proceeds," Provident Funding will be dismissed from the litigation, and "[t]he disposition of any excess proceeds will be for the remaining parties and the Court to determine/decide." All defendants stipulated "that they will not seek to make Provident Funding a party to or otherwise involve Provident Funding in" the Gardner lawsuit. The parties also agreed that "[i]f the sales proceeds are insufficient to pay the debt owed to Provident Funding in full, the case shall proceed without prejudice to Provident Funding's right to obtain a deficiency judgment and other appropriate relief."[3]

---

[3] The Stipulation also provided that, with respect to the property's tenants, "[a]ll net rental income collected by the Commissioner until the sale of the property is completed will be applied to the outstanding amount owed to Provident Funding." Gardner agreed to "assume any tax liability associated with the Commissioner's collection of rent" while

(continued . . .)

5

The Stipulation was filed with the court, which signed the Stipulation "approved and so ordered." (Capitalization altered.)

### 3. The Motion to Compel

On November 23, 2016,[4] Gardner filed a "Motion to Compel and for Sanctions" (Motion). She represented that the Blue Wave defendants had "block[ed]" the April 29, 2016 transaction in contravention of the Stipulation. Thus, Gardner moved the court to compel the Blue Wave defendants to, among other things, take all necessary steps to transfer the real property to the April 29, 2016 transaction buyer, and asked for sanctions against the Blue Wave defendants.

Gardner presented the following version of events.[5] She claimed that she notified the Blue Wave defendants of the April 29, 2016 buyer in May 2016 - a transaction of which

_____

the Blue Wave defendants agreed to "promptly pay the arrearages owed to the utility company, turnover all leases, keys and security deposits to the Commissioner and cooperate in good faith with the Commissioner's further requests[.]" The Blue Wave defendants also agreed "to take full[ ]responsibility for any claims made by the tenants for unreimbursed security deposits." If a private sale, the April 29, 2016 transaction, or a foreclosure sale did not result in sufficient funds to "satisfy the claims of the tenants," the defendants agreed to "promptly pay into Court all amounts claimed by the tenants to be owed by the landlord[.]"

[4] While the Stipulation allowed the foreclosure sale to proceed on October 25, 2016, Gardner represented that "[o]n October 24, 2016, the foreclosure sale was continued until November 29, 2016 to provide additional time for the [p]arties to close the April 29, 2016 transaction or a second transaction[.]"

[5] We provide the parties' representations about what occurred after the Stipulation only for background and make no suggestion about the accuracy of their factual claims.

6

Provident Funding approved - and requested "access and cooperation to sell the [m]ortgaged [p]roperty," which the Blue Wave defendants refused.  After the parties entered into the Stipulation, "on or about October 12, 2016, a Purchase Contract . . . was fully executed between Gardner, the [Blue Wave] [d]efendants, and Brian Rose," wherein Rose, a buyer found by the Blue Wave defendants, agreed to purchase the property for $789,000 ($89,000 more than the April 29, 2016 transaction sale price) (Rose contract).  However, Provident Funding refused to allow additional time to close the Rose contract, and instead, "in consequence of [the Blue Wave defendants'] lack of cooperation regarding rent, failure to pay outstanding utility bills, and the failure to open an escrow by the October 18, 2016 deadline, the Parties['] obligation to close the April 29, 2016 transaction . . . was triggered."  Thus, Provident Funding - over objection by the Blue Wave defendants - asked for the foreclosure sale to be continued for thirty days in order for the April 29, 2016 transaction to close.

Between October 20, 2016 and October 26, 2016, the Blue Wave defendants asked several times to postpone the foreclosure sale in order to close the Rose contract.  Provident Funding refused, taking the position that at that point, Paragraph 3 of the Stipulation required the parties to cooperate in closing the April 29, 2016 transaction; they nonetheless

7

"stated their willingness to accept the Rose [c]ontract if it closed prior to the April 29, 2016 transaction[.]" Upon requests by Provident Funding and Gardner for "tangible proof of progress" on the Rose contract, the Blue Wave defendants represented on November 2, 2016 that Rose would not proceed unless given forty-five days to close. On November 17, 2016, Gardner "explained that closing the April 29, 2016 transaction required the [Blue Wave] [d]efendants['] cooperation," to which the Blue Wave defendants replied that the foreclosure auction date should not be extended because Rose intended to bid $750,000 at auction. From these exchanges (which occurred via email, of which copies were attached to the motion as exhibits), Gardner concluded that "the [Blue Wave defendants'] failure to respond and the tenor of the email suggests that no cooperation is forthcoming." She further represented that the April 29, 2016 buyer remained ready, willing, and able to close. Accordingly, she sought a court order compelling the Blue Wave defendants to proceed with the April 29, 2016 transaction, in addition to sanctions against them.

4.    **Provident Funding's Position Statement**

Provident Funding submitted a "Position Statement" regarding the Motion on November 23, 2016. In it, Provident Funding represented that they intended to proceed with the November 29, 2016 foreclosure but remained willing to accept the

proceeds from the April 29, 2016 transaction "in satisfaction of the debt" so long as those proceeds were tendered no later than December 14, 2016. It was Provident Funding's position that "[p]er Paragraph 3" of the Stipulation, "under the present circumstances," the Blue Wave defendants agreed to "proceed in good faith with" the April 29, 2016 transaction. Provident Funding noted that if the foreclosure action were not dismissed, as agreed in the Stipulation, "due to the lack of cooperation by the [Blue Wave defendants]," Gardner should "bear the expense of moving the court for an order dismissing the case and . . . the [Blue Wave defendants] should be ordered to reimburse Provident Funding" for any costs incurred by Provident Funding "as a result of their failure to honor their obligations under the Stipulation."

### 5. The Blue Wave Defendants' Memorandum in Opposition

In their memorandum in opposition (filed after the foreclosure auction proceeded on November 29, 2016, and the property was sold to Provident Funding for $447,040), the Blue Wave defendants characterized the post-Stipulation events as follows. They alleged that they received the $789,000 offer that became the Rose contract in late September. On September 29, 2016, the Rose contract "was signed by Mr. Rose as Buyer and Blue Wave and Gardner as Sellers." The next day, "Blue Wave and Gardner signed an Exclusive Right-To-Sell Listing

Contract" authorizing a particular realtor "to sell or exchange" the property. In early October, the Blue Wave defendants communicated to Provident Funding that Rose was waiting to proceed on the sale pending their approval; on October 12, Provident Funding told the parties that it "would approve of the Rose [c]ontract, but subject to maintaining the right, under the First Stipulation, to move forward with the foreclosure[] sale on October 25, 2016 at noon if the Rose [c]ontract ha[d] not closed before then." The Blue Wave defendants replied that Rose needed more time to close. They attempted to find out from Rose how much time he needed, at which point the Blue Wave defendants learned that "the Rose [c]ontract could not move forward until the other escrow" associated with the April 29, 2016 transaction closed. They asked Gardner to close the other escrow, but "Gardner's counsel refused[.]"

After communicating "the escrow situation" to the parties, "[o]n October 19, 2016, Provident's counsel, citing the terms of the First Stipulation, said that Provident would not give the Rose [c]ontract additional time to close and that Provident expected the parties to proceed to close the [April 29, 2016 transaction]." Provident Funding denied a request by both defendants for a 30-day extension to close the Rose contract, but two days later asked the Commissioner to continue the foreclosure for thirty days for the April 29, 2016

10

transaction to close.  The Blue Wave defendants objected, arguing that Provident Funding should have allowed "a reasonable extension" for the Rose contract to close if they were willing to do so for the April 29, 2016 transaction.  By October 26, 2016, Rose had made it clear to the Blue Wave defendants he wanted to proceed but could not close unless given forty-five days; he also represented to the Blue Wave defendants that at auction, "he would likely bid at least $750[,000] for the Property."  On October 26, 2016, the Blue Wave defendants asked for an extension to allow the Rose contract to close, which Provident Funding denied two days later.  The Blue Wave defendants reiterated that Rose needed "assurance that he would be given a reasonable time (45 days) to close" on November 2, 2016.  On November 17, 2016, "Blue Wave's counsel sent to the parties an email objecting to any further extension of the foreclosure auction for the purpose of closing the [April 29, 2016 transaction]."

The Blue Wave defendants argued that in fact, Provident Funding and Gardner "did not comply with the terms of the First Stipulation, and it is unreasonable for Gardner to now claim that the Blue Wave [d]efendants are not complying with such First Stipulation," and that they did not act in bad faith. Gardner and Provident Funding did not "cooperate[ ] in good faith with the Rose [c]ontract," and "[i]t is unreasonable for

Gardner to refuse to cooperate in good faith with the Rose [c]ontract, and then claim that the Blue Wave [d]efendants are not cooperating with the [April 29, 2016 transaction]."

After a hearing, the court orally denied the Motion:

> Okay. Okay. Well, this is a foreclosure court, and normally unless all the parties agree to a private sale, we normally agree to proceed with the foreclosure sale. And but the court after the confirmation still has the -- still takes a look to see whether or not the price obtained at any confirmation is fair and reasonable so that's something that would be left for the court to determine at a later date.
>
> So with that, you know, <u>it doesn't seem like the parties have any agreement for private sale here</u>. The court will be denying this motion here today, and the court asks [the Blue Wave defendants' counsel] to prepare the order for that.

(Emphasis added.)

## 6. Confirmation of Sale

Provident Funding moved to confirm the sale thereafter. At the hearing on the motion to confirm sale, bidding was reopened, which resulted in a high bid of $635,000 from Rose. But Gardner, against whom deficiency was to be entered, nonetheless asked the court to:

> exercise your discretion. And to the extent that [ ] requires you to set th[e circuit court's earlier order denying the motion to compel and for sanctions] aside, I would, because the equities here, the fairness, is that my client is being subjected to this deficiency judgment. It wasn't her fault. She had an agreement by the Court and by all the parties, and she complied with that. And it would have resulted in zero deficiency. And it's not because my client did anything to stop that stipulation from going forward. And I think, as [Provident Funding] pointed out in [its] brief, it's because the [Blue Wave defendants] refused to adhere to that stipulation.

The court granted Provident Funding's motion,

12

confirming the $635,000 sale to Rose, and declined Gardner's request to set aside the deficiency judgment "or any portion of [the court's] order denying the motion to compel." It noted that the dispute between Gardner and the Blue Wave defendants should be pursued elsewhere and that "nothing . . . would preclude you from seeking whatever damages you believe you[] would be entitled to[.]"

**B.    ICA Proceedings**

Gardner appealed, challenging (1) the circuit court's conclusion that there was no agreement for a private sale, (2) the circuit court's conclusion that the Stipulation was not enforceable and that the Blue Wave defendants had not breached it, and (3) the circuit court's denial of the Motion.[6]

The ICA affirmed the circuit court in a Summary Disposition Order (SDO). It first held that "[t]he Circuit Court's finding [that] there was no agreement for a private sale was not clearly erroneous." It explained that the Stipulation must be interpreted using "contract law principles," and "[t]o

---

[6]    Before the Blue Wave defendants filed their answering brief at the ICA, Gardner filed a motion for partial dismissal and a stipulation between herself and Provident Funding, which asserted that none of the issues on appeal pertained to Provident Funding and that both parties agreed for Provident Funding to be dismissed. The Blue Wave defendants opposed dismissing Provident Funding, as they alleged they were neither informed that a dismissal was being pursued nor told of the terms of the stipulated dismissal, and that partial dismissals were not contemplated by the Hawai'i Rules of Appellate Procedure. The ICA granted the motion to dismiss, and Provident Funding was not involved in the appeal thereafter. The dismissal of Provident Funding is not at issue before this court.

be enforceable, a contract must be certain and definite as to its essential terms." (Quoting Boteilho v. Boteilho, 58 Haw. 40, 42, 564 P.2d 144, 146 (1977).) While "[t]he intent of the parties is a question of fact," whether the contract is ambiguous is a question of law, and "[a]mbiguity in the terms of the document raises questions regarding the parties' intent to agree." (Citing Found Int'l Inc. v. E.T. Ige Constr., Inc., 102 Hawai'i 487, 497, 78 P.3d 23, 33 (2003); 1 Corbin, Contracts § 4.10 (2019).)

The ICA found ambiguity in the word "cooperate" as used in the Stipulation: "The word cooperate has two definitions; one definition requires collaboration, while another requires compliance with another's directives." (Citation omitted.) Because of this ambiguity, the ICA turned to parol evidence in order to "explain the circumstances surrounding the execution of the contract[.]" (Quoting Hokama v. Relinc Corp., 57 Haw. 470, 474, 559 P.2d 279, 282 (1977).) Applying the rule, the ICA described what the parties represented on the record after entering into the Stipulation:

> At the December 20, 2016 hearing,[7] the three parties' counsel provided argument regarding the intent behind the Stipulation. Gardner's counsel argued the Stipulation arose after attempts to settle the related civil case, pointing to a hearing where "it was strongly pointed out that a joint sale would be a way to resolve this." [The Blue Wave defendants'] counsel told the court that his clients "continued to propose to proceed on a mutual basis

_____

7    This hearing pertained to Gardner's Motion and occurred nearly three months after the Stipulation was entered.

14

> with a mutually acceptable realtor" to accomplish such a
> sale.  Provident's attorney maintained that the Stipulation
> was drafted by Provident's counsel to provide the bank with
> some assurance that the parties would work to settle their
> "dysfunction" as an alternative to the foreclosure sale but
> gave them a deadline so the bank "would not be waiting
> indefinitely."

(Alterations omitted.)

Accordingly, "[t]he parties argue on appeal that the Stipulation was meant to be a stipulation[,] but each cite different purposes."  The ICA concluded that the Stipulation "lacked written terms" stating the essential elements of a settlement agreement, so it could not be construed as such. Likewise, "[t]he Circuit Court . . . considered and rejected the notion that the parties had an agreement for sale of land," and consistent with that conclusion, the Stipulation also lacked the essential terms for a contract of that type (for instance, "identification of the parties, a description of the property sold, the price, [and] the time and manner of payment"). (Quoting In re Application of Sing Chong Co., Ltd., 1 Haw. App. 236, 239, 617 P.2d 578, 581 (1980).)

The ICA reasoned that "[a]n agreement that leaves an essential element 'to be settled by further negotiation . . . is merely an agreement to agree and is not a valid and binding contract.'"  (Quoting Carson v. Saito, 53 Haw. 178, 181, 489 P.2d 636, 638 (1971).)  "Given the essential terms the parties had left to work out regarding the sale of the property, the

Circuit Court was not clearly erroneous in finding lack of agreement on the sale. . . . Where agreement cannot be ascertained from terms in the agreement or implied in law, there is no binding contract." In light of this conclusion, the ICA did not consider whether the Blue Wave defendants breached the Stipulation.

Finally, the ICA determined that the circuit court did not abuse its discretion by denying Gardner's motion for sanctions. The ICA construed Gardner's brief as alleging "that [the Blue Wave defendants] and attorneys should be sanctioned for their representation[] that a 'potential buyer' would bid (1) over $700,000 at auction and (2) at least $750,000 at auction, bids that ultimately failed to materialize." Because those bidders were under no obligation to bid and indeed, the prospect of higher bids "helped Gardner because they were the basis for re-opening the public sale," such representations did not constitute a basis for sanctions.

## C.  Supreme Court Proceedings

Gardner presents three questions in her application for certiorari: (1) whether the ICA erred by affirming the circuit court's conclusions that the parties had no agreement for a private sale, (2) whether the ICA erred by "fail[ing] to consider whether [the Blue Wave defendants] breached the Stipulation," and (3) whether the ICA erred by concluding the

circuit court "did not abuse its discretion regarding Gardner's motion for sanctions."  Gardner's application asks, among other things: "If parties and their attorneys can now argue that stipulations entered in the court's record and approved by the court are not enforceable because the terms are not deemed to be a contract, then what value is a stipulation?"

## III. STANDARDS OF REVIEW

### A.    Interpretation of a Stipulation

A stipulation is reviewed using contract law principles.  See Restatement (Second) of Contracts § 94 (2020). "The construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." Balogh v. Balogh, 134 Hawai'i 29, 37, 332 P.3d 631, 639 (2014) (citation, quotation marks, and brackets omitted); Found. Int'l, 102 Hawai'i at 497, 78 P.3d at 33 ("In the absence of any ambiguity, a question of construction arising upon the face of the instrument is for the court to decide." (citation omitted)).

### B.    Denial of Sanctions

The decision to impose sanctions is within a circuit court's discretion.  Fujimoto v. Au, 95 Hawai'i 116, 137, 19 P.3d 699, 720 (2001).  A court abuses its discretion if it "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant."  OneWest Bank, F.S.B. v. Ass'n of Owners of Kumulani

17

at Uplands at Mauna Kea, 146 Hawai'i 105, 111, 456 P.3d 178, 184 (2020) (citation omitted).

## IV. DISCUSSION

The circuit court's denial of sanctions[8] seemed to be based on its determination that the parties did not "have any agreement for private sale." The ICA likewise determined that there was "no binding contract" in this case. Of course, sanctions cannot be imposed for violating an agreement that does not exist. But the Stipulation was indeed a binding agreement, albeit not one for private sale, that should have been given due effect.

"Any matter that involves the individual rights or obligations among the parties in an action or proceeding in court may properly be made the subject of a stipulation between them[.]" 83 C.J.S. Stipulations § 24 (2020). Parties have leeway to bind themselves in a stipulation, and such agreements

---

[8] Before filing her Opening Brief, Gardner moved first to stay the judgment of the circuit court confirming sale. The ICA denied the motion, explaining that Gardner was required to first file a motion for a stay in the circuit court or otherwise explain why doing so would be "impracticable" pursuant to Hawai'i Rules of Appellate Procedure Rule 8. Thus, the foreclosure sale has long since happened and was not stayed, and the confirmation of the sale is not at issue. In light of this backdrop, to the extent that Gardner challenges the circuit court's denial of her request to compel the Blue Wave defendants to transfer the property to the buyer involved in the April 29, 2016 transaction, that issue is moot. We agree with the Blue Wave defendants that, as they asserted in their response opposing Gardner's application for writ of certiorari, "the only matter remaining before [this court] is the ICA's decision affirming the Circuit Court's Order Denying Sanctions."

will be broadly enforced:

> <u>Parties by their stipulations may in many ways make the law for any legal proceeding to which they are parties, which not only binds them, but which the courts are bound to enforce</u>.  They may stipulate away statutory, and even constitutional rights.  They may stipulate for shorter limitations of time for bringing actions for the breach of contracts than are prescribed by the statutes, such limitations being frequently found in insurance policies.  They may stipulate that the decision of a court shall be final, and thus waive the right of appeal; and <u>all such stipulations not unreasonable, not against good morals or sound public policy, have been and will be enforced</u>; and, generally, <u>all stipulations made by parties for the government of their conduct or the control of their rights in the trial of a cause or the conduct of a litigation are enforced by the courts</u>.

<u>Okuhara v. Broida</u>, 51 Haw. 253, 256–57, 456 P.2d 228, 230–31 (1969) (citation omitted) (emphases added).

In short, then, "parties ordinarily are bound by the terms of their stipulations[.]"  <u>Gakiya v. Hallmark Props., Inc.</u>, 68 Haw. 550, 555, 722 P.2d 460, 464 (1986); <u>Yoneji v. Yoneji</u>, 137 Hawai'i 299, 315, 370 P.3d 704, 720 (App. 2016) ("A trial court is bound to follow the procedures set forth in a stipulation, unless there was a finding of manifest injustice."); <u>see also</u> <u>Moore v. Richard W. Farms, Inc.</u>, 437 S.E.2d 529, 531 (N.C. Ct. App. 1993) ("Once a stipulation is made, a party is bound by it[.]"); <u>Nishman v. De Marco</u>, 76 A.D.2d 360, 368 (N.Y. App. Div. 1980) ("The judicial policy in favor of the enforcement of stipulations . . . has found widespread application.").

Stipulations are interpreted by applying principles of contract law.  73 Am. Jur. 2d <u>Stipulations</u> § 6 (2020) ("The

19

rules of contract interpretation apply to stipulations."); see Burlington Ditch Reservoir & Land Co. v. Metro Wastewater Reclamation Dist., 256 P.3d 645, 676 (Colo. 2011) ("Stipulations are contracts, binding upon their signatory parties, and interpreted under contract law principles."); Czumak v. N.H. Div. of Developmental Servs., 923 A.2d 208, 213 (N.H. 2007) ("A stipulated agreement is contractual in nature and, therefore, is governed by contract rules."); Nishman, 76 A.D.2d at 366 ("A stipulation is a contract between parties, and as such is governed by general principles for its interpretation and effect[.]").  Unlike contracts, however, they generally need not be supported by consideration to be enforceable.  Lillard Pipe & Supply, Inc. v. Bailey, 387 P.2d 118, 122 (Okla. 1963) ("Although stipulations are unlike ordinary contracts in that no consideration or mutuality is required, they are to be construed like other contracts between parties."); 73 Am. Jur. 2d Stipulations § 1 (2020) ("While a stipulation has been described as a contract, some of their incidents do not inhere in ordinary contracts.  Thus, for example, no consideration is necessary to the validity of a stipulation, and no mutuality is required." (footnotes omitted)).

The ICA determined that the "lack of essential terms" in the Stipulation to create either a settlement agreement or a contract for the sale of land rendered it so uncertain as to be

20

unenforceable.  While it is true that a contract indeed may fail for lack of definiteness, such a construction is disfavored, and the Stipulation here survives that inquiry.  "To be enforceable, a contract must be certain and definite as to its essential terms."  Boteilho, 58 Haw. at 42, 564 P.2d at 146; see also Honolulu Waterfront Ltd. P'ship v. Aloha Tower Dev. Corp., 692 F. Supp. 1230, 1236 (D. Haw. 1988) (recognizing that under Hawai'i law, contracts may be too indefinite to be enforceable) (citing Sing Chong, 1 Haw. App. at 239, 617 P.2d at 581).  "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  Almeida v. Almeida, 4 Haw. App. 513, 519, 669 P.2d 174, 179 (App. 1983) (quoting Restatement (Second) of Contracts § 33 (1981)).  However, "the law leans against the destruction of contracts for uncertainty.  Courts favor the determination that an agreement is sufficiently definite.  We will, if possible, so construe the agreement so as to carry into effect the intention of the parties."  Sing Chong, 1 Haw. App. at 239, 617 P.2d at 581 (citation omitted); see also Hi-Pac, Ltd. v. Avoset Corp., 26 F. Supp. 2d 1230, 1235 (D. Haw. 1997).

The ICA misapplied this doctrine when it attempted to map the essential terms of a settlement agreement or of a contract for sale of land onto the Stipulation.  That the Stipulation is neither does not end the inquiry.  Instead, the

21

ICA should have avoided "the destruction of contracts for uncertainty" and "construe[d] the agreement [so] as to carry into effect the intention of the parties" as embodied by the agreement if possible. <u>Sing Chong</u>, 1 Haw. App. at 239, 617 P.2d at 581.

Here, an enforceable construction of the Stipulation is possible. The Stipulation bound the parties to use good faith efforts to either close a private sale or close the April 29, 2016 transaction by the agreed-upon deadline. Per Paragraph 3 of the Stipulation, "If there is no active purchase contract for the private sale of the property pending as of September 23, 2016, or if a private sale is not closed on or before October 18, 2016," the parties "agree[d] to proceed in good faith" and to "cooperate to close the April 29, 2016 transaction." Thus, the Stipulation provided, as relevant here, the following terms: (1) All defendants would "cooperate in a good faith effort to sell the property" to a third-party buyer; (2) If no private sale closed before October 18, 2016, the parties would "proceed in good faith with" and "cooperate to close the April 29, 2016 transaction"; (3) During this period, Provident Funding would not seek a foreclosure sale; and (4) If neither a third-party contract nor the April 29, 2016 transaction closed, a foreclosure sale would proceed. These terms are sufficiently definite because they "provide a basis

22

for determining the existence of a breach and for giving an appropriate remedy."  Restatement (Second) of Contracts § 33 (1981).  Gardner or the Blue Wave defendants would have breached if either one failed to "cooperate in a good faith effort" to find a third-party buyer or, in the event no private sale closed by October 18, 2016, if either one failed to "cooperate to close" the April 29, 2016 transaction.

Even if there were some ambiguity in the Stipulation, we disagree with the ICA that an ambiguity in a contractual term casts doubt on whether the parties intended to be bound at all. To the contrary, in the face of an ambiguity, "[t]he court's objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety." Hawaiian Ass'n of Seventh-Day Adventists v. Wong, 130 Hawai'i 36, 45, 305 P.3d 452, 461 (2013) (quotation marks and citation omitted) (emphasis added).  Indeed, although the parties later in the proceedings offered different perspectives on why they entered into the Stipulation, the purposes presented by the parties – while relevant to resolving ambiguity – are irrelevant to the objective inquiry over whether the parties intended to be bound at all.  Earl M. Jorgensen Co. v. Mark Constr., Inc., 56 Haw. 466, 470, 540 P.2d 978, 982 (1975) ("The existence of mutual assent or intent to accept is determined by an objective standard.").  That test is whether the parties' "words or acts

23

. . . under a standard of reasonableness . . . manifested an objective intention to agree." Id. Even if the parties had argued that they did not enter the Stipulation with the intent to form a binding agreement,[9] the fact that they signed the Stipulation and filed it with the court leaves a reasonable observer no doubt that the parties mutually assented to be bound by the Stipulation's terms.

We therefore must look to the instrument itself to discern whether its terms are clear, and although our goal is to effectuate the parties' intent, we must glean that intent from the Stipulation itself. 83 C.J.S. Stipulations § 46 (2020) ("The primary rule is that the court must, if possible, ascertain and give effect to the intent of the parties. . . . An appellate court analyzes the language of a stipulation to determine the parties' intentions and ends its inquiry if the language is clear." (footnotes omitted)). "It is well settled that courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous." State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc., 90 Hawaiʻi 315, 324, 978 P.2d 753, 762 (1999) (citing Hanagami v. China Airlines, Ltd., 67 Haw. 357, 364, 688 P.2d

_____

[9] No party argued as much, and indeed, the Blue Wave defendants' memorandum in opposition to the Motion and their answering brief at the ICA claimed that it was Gardner and Provident Funding who breached – an argument predicated on the Stipulation being binding.

24

1139, 1144 (1984)).  While the parties disagreed ex post about the Stipulation's meaning and effect, this disagreement "does not render clear language ambiguous."  State Farm, 90 Hawai'i at 324, 978 P.2d at 762.  Instead, "[a]s a general rule, the court will look no further than the four corners of the contract to determine whether an ambiguity exists."  Hawaiian Ass'n of Seventh-Day Adventists, 130 Hawai'i at 45, 305 P.3d at 461.

We disagree with the ICA that the Stipulation is ambiguous.  "Contract terms are interpreted according to their plain, ordinary, and accepted sense in common speech."  Id.  "A contract is ambiguous when its terms are reasonably susceptible to more than one meaning."  Id.  The ICA found ambiguity in the term "cooperate," which it concluded could be reasonably construed to either require "collaboration" or "compliance with another's directives."  To "cooperate" means "to act or work with another or others."  Cooperate, Merriam-Webster.com Dictionary, 275 (11th ed. 2009), https://perma.cc/X9BJ-ZUJR. The other dictionary cited by the ICA, Macmillan, likewise defines cooperate as: "to work with other people to achieve a result that is good for everyone involved."  Cooperate, Macmillan Dictionary Online, https://perma.cc/5UXP-SP3S. Black's Law Dictionary similarly defines "cooperation agreement" as "any contract by which the parties bind themselves to work jointly towards some mutually beneficial ends."  Cooperation

agreement, Black's Law Dictionary (11th ed. 2019) (emphasis added).  In essence, then, to cooperate means to work together.

The second definition in Macmillan does pertain to, as the ICA put it, "compliance with another's directives": "to do what someone asks you to do, especially by providing them with information."  Macmillan Dictionary Online, https://perma.cc/5UXP-SP3S.  However, this definition does not fit within the context of the Stipulation, which requires the parties to cooperate - implicitly, with each other.  See Found. Int'l, 102 Hawai'i at 496-97, 78 P.3d at 32-33 ("[T]he test [of ambiguity] lies not necessarily in the presence of particular ambiguous words or phrases but rather in the purport of the document itself, whether or not particular words or phrases in themselves be uncertain or doubtful in meaning." (emphasis added)); Cherokee Metro. Dist. v. Upper Black Squirrel Creek Designated Ground Water Mgmt. Dist., 247 P.3d 567, 573 (Colo. 2011) ("To determine whether there is ambiguity [in a stipulation], courts must examine the instrument's language and construe it in harmony with the plain and generally accepted meaning of the words employed.").  The Stipulation does not require the Blue Wave defendants to cooperate with Gardner (or vice versa), nor does it contemplate who would be giving the directives if that were what "cooperate" meant.  Thus, the term "cooperate" as used in the agreement is not "reasonably

26

susceptible" to the ICA's other suggested definition. <u>Hawaiian Ass'n of Seventh-Day Adventists</u>, 130 Hawai'i at 45, 305 P.3d at 461.

Accordingly, the commonly-understood meaning of cooperate - to work together - applies, and we need not look beyond the Stipulation itself because the intentions of the parties are clear from the instrument. When the Stipulation required the parties to "cooperate to close the April 29, 2016 transaction," it bound the parties to work together to close the April 29, 2016 transaction once that provision was triggered (which would occur if no private sale closed before October 18, 2016). Said differently, once no private sale closed by October 18, 2016, the parties were obliged to work together to close the April 29, 2016 transaction. To be sure, the Stipulation was not an agreement for the sale of the property – it did not purport to transfer title to one of the signatories – nor was it a settlement – it did not relinquish any party's claims in the lawsuit. It was, however, an agreement with discernible and enforceable terms, which "not only binds [the parties], but which the courts are bound to enforce." <u>Okuhara</u>, 51 Haw. at 256, 456 P.2d at 230.

Importantly, however, this rule is subject to exceptions. We noted in <u>Gakiya</u> that "certain stipulations [may] be set aside or modified in order to prevent manifest

27

injustice." 68 Haw. at 555, 722 P.2d at 464 (determining that "the prevention of manifest injustice required . . . a departure [from the stipulation] in this case" because enforcing the stipulation would have left a party who had suffered "serious financial injury" "with virtually no source of relief"); see also 83 C.J.S. Stipulations § 1 (2020) ("Valid stipulations entered into freely and fairly should not be lightly set aside," but may be "when their enforcement would result in serious harm to one of the parties and the other party would not be prejudiced by their being set aside." (footnote omitted)). In addition, "the parties' stipulation as to a question of law is not binding on the court[.]" Hawaiian Ass'n of Seventh-Day Adventists, 130 Hawai'i at 46, 305 P.3d at 462.

Moreover, we recognize that the Stipulation was made in the course of a mortgage foreclosure proceeding, which is "equitable in nature and is thus governed by the rules of equity." Santiago v. Tanaka, 137 Hawai'i 137, 157, 366 P.3d 612, 632 (2016) (quoting Beneficial Haw., Inc. v. Kida, 96 Hawai'i 289, 312, 30 P.3d 895, 918 (2001)). "Courts of equity have the power to mold their decrees to conserve the equities of the parties under the circumstances of the case." Peak Cap. Grp., LLC v. Perez, 141 Hawai'i 160, 179, 407 P.3d 116, 135 (2017) (citation omitted). "In general, stipulations are not to be lightly set aside." In re Lenox, 902 F.2d 737, 739 (9th Cir.

28

1990).  In an equitable foreclosure proceeding, a trial court should enforce the terms of a stipulation unless doing so would be inequitable.  Wilson v. Witt, 952 P.2d 214, 216 (Wyo. 1998) ("[A court's authority to alter or nullify a contract] does not extend so far as to authorize a court of equity to disregard and set aside a valid stipulation of the parties upon the performance of which their rights are made to depend in the absence of some equitable basis." (emphasis added) (citation omitted)).

Although trial courts generally have wide latitude to deny sanctions, here, the record is devoid of any other basis for which the sanctions motion was denied besides the erroneous conclusion that the Stipulation was not binding.  The circuit court therefore erred, and we remand this case for further proceedings.

This decision neither opines on whether sanctions would or would not be appropriate on remand, nor suggests anyone necessarily breached the Stipulation.  Indeed, it may well be the case that sanctions are inappropriate and that all parties complied with the Stipulation's terms.  We write today solely to clarify that agreements made during the course of litigation, reduced to writing, signed by all parties, and given the imprimatur of the court must generally be treated as binding. "In essence, a stipulation is a contract, or at least akin to

29

one, and is entitled to all the sanctity of a conventional contract." 83 C.J.S. Stipulations § 1 (2020) (footnotes omitted). In addition to the well-established principles of law undergirding this holding, sound policy reasons support it as well. The stipulation in this case represented a mutual agreement to pursue a sale that presumably would leave all parties better off, potentially avoiding a costly judicial process and resolving the litigation amicably. Agreement between adversarial parties on issues during the litigation makes the litigation process smoother and less costly for all. But if stipulations are not given binding effect, then parties will be less likely to enter into them for fear that they will later be rendered toothless. In short, parties must be able to rely on the terms of an agreement and arrange their affairs in accordance therewith, and accordingly, absent a sufficient reason to set them aside, stipulations are binding on those who agree to them.

## V. CONCLUSION

For the foregoing reasons, the ICA's January 3, 2020 judgment on appeal and the circuit court's May 5, 2017 judgment are vacated in part, with respect to the circuit court's January 6, 2017 Order Denying Sanctions, but are otherwise

affirmed.  The case is remanded to the circuit court for proceedings consistent with this opinion.

Glen T. Hale
for petitioner

Matthew M. Matsunaga and
Derek R. Kobayashi
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins

